Rosalinda **PEREZ**, et al., Plaintiffs,

v.

**PASADENA INDEPENDENT SCHOOL DISTRICT**, et al., Defendants.

**Civil Action No. H–92–3578.**

United States District Court, S.D. Texas, Houston Division.

March 13, 1997.

Frumencio Reyes, Jr., Reyes & Reyes–Castillo, Houston, TX, Jose Garza, Gray and Becker, Austin, TX, for plaintiffs.

David Frishman, Katy, TX, Bernard Erwin Brooks, Bernard E. Brooks & Associates, Stafford, TX, Ronald S. Block, Block & Muscat, Stafford, TX, for Defendants.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

TABLE OF CONTENTS

The Legal Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1200

Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1202

  I. The Parties .................................................1202

 II. The Background of this Lawsuit ......................................1203

III. The Fact and Expert Witnesses ......................................1204

 IV. The First *Gingles* Factor ...........................................1204
     A. The 1990 Census: Distribution of Hispanic Voting–Age Population in
        the PISD ...........................................................1204
     B. The Proposed Single–Member District Plans ...........................1205
     C. *Gingles* I: A Sufficiently Large and Compact Group of *Voting–Age
        Citizens* ..........................................................1208
     D. *Gingles* I: 1990 Census Figures on Hispanic Voting–Age Citizens .........1209
     E. *Gingles* I and Projected Population Trends ...........................1210
        1. Reliability Problems in the 1990 Census.........................1210
        2. Reliability Problems in the 1997–98 Projections....................1211
        3. The Least Unreliable Alternative ..............................1212

  V. The Second and Third *Gingles* Factors ..................................1213
     A. Analysis of PISD Board Elections ..................................1213
        1. The 1987 Election (Position 2) ................................1216
        2. The 1987 Election (Position 3) ................................1216
        3. The 1988 Election (Position 5) ................................1217
        4. The 1989 Election (Position 6) ................................1217
        5. The 1990 Election (Position 2) ................................1217
        6. The 1993 Election (Position 1) ................................1218
        7. The 1993 Election (Position 2) ................................1218
        8. The 1993 Election (Position 3) ................................1218
        9. The 1994 Election (Position 4) ................................1219
       10. The 1994 Election (Position 5) ................................1219
       11. The 1995 Trustee Election ....................................1219
       12. The 1996 Election (Position 2) ................................1219
       13. The 1997 Election (Position 5) ................................1220
     B. *Gingles* II: The Political Cohesion of the Minority Group .............1220
        1. The Limitations of the Statistical Election Analysis.................1220
        2. Hispanic Political Cohesion....................................1221
     C. *Gingles* III: Legally Significant Bloc Voting ...........................1221
 VI. The *Zimmer* Factors ...............................................1222
     A. Voting Barriers ..................................................1222
     B. Candidate Slating Process ........................................1223
     C. Vestiges Within the School System.................................1224
     D. Socioeconomic Factors ...........................................1224
     E. Exogenous Elections ..............................................1225
        1. Regression Analyses of Exogenous General Elections...............1225
        2. General Analysis of the Exogenous Elections .....................1227
     F. Racial Appeals ..................................................1227
     G. Responsiveness of the PISD .......................................1227
     H. The Value of the State's Interest ..................................1227

VII. Evidence of Invidious Discriminatory Intent..............................1228

Conclusions of Law ......................................................1228

  I. *Gingles* I: A Sufficiently Large and Geographically Compact Group ..........1228

 II. *Gingles* II: Political Cohesion of the Minority ............................1229

III. *Gingles* III: Legally Significant Bloc Voting .............................1229

 IV. The *Zimmer* Factors ...............................................1229

V. The Totality of the Circumstances .......................................1230

VI. The Fourteenth and Fifteenth Amendments ..............................1230

VII. Conclusion

Appendix ........................................................................1231

In this voting rights case, plaintiffs challenge the at-large voting system for electing members of the school board for the Pasadena Independent School District (the "PISD"). Plaintiffs contend that the current system dilutes the votes of politically cohesive Hispanics in the PISD, in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973, *et seq.,* and the Fourteenth and Fifteenth Amendments to the United States Constitution.

The parties presented evidence to the court from May 31, 1995 through June 8, 1995. Because significant legal developments occurred after that date, this court reopened the record on February 10, 1997 to hear arguments and evidence on elections and relevant demographic changes which had taken place since June 1995.

"Because the resolution of a voting dilution claim requires close analysis of unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, ... district courts [must] explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning." *Westwego Citizens for Better Gov't v. City of Westwego,* 872 F.2d 1201, 1203 (5th Cir.1989); *quoting Velasquez v. City of Abilene,* 725 F.2d 1017, 1020 (5th Cir.1984).[1] In accordance with the requirements of FED. R. CIV. P. 52(a) and the Fifth Circuit precedents, this court examines the applicable law and sets out its Findings of Fact and Conclusions of Law.

### THE LEGAL FRAMEWORK

The fundamental question in this section 2 vote dilution case is whether, as a result of the at-large system for the PISD school board elections, Hispanics in the PISD "do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles,* 478 U.S. 30, 44–45, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986).

Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, as amended, provides that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population.

42 U.S.C. § 1973 (emphasis in original).

■ Section 2 claims brought against at-large voting, or "multimember" election schemes, are governed by *Thornburg v. Gin-*

---

1. The Fifth Circuit has emphasized that there is a "special need for detailed findings of fact in vote dilution cases." *Westwego Citizens for Better Gov't v. Westwego,* 872 F.2d 1201, 1203 (5th Cir.1989); *see also Overton v. City of Austin,* 871 F.2d 529, 530–31 (5th Cir.1989) (the district court must perform a "searching and practical evaluation of 'past and present reality' ").

*gles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In *Gingles,* the Supreme Court held that the use of at-large voting would not impede "the ability of minority voters to elect representatives of their choice" unless there is a white bloc voting majority that would *"usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." 478 U.S. at 47–48, 106 S.Ct. at 2765 (emphasis added). The plaintiffs must meet the *Gingles* three-part threshold test:

> *[f]irst* that the group is sufficiently large and geographically compact to constitute a majority in a single member district; *second,* that it is politically cohesive and *third,* that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

*Growe v. Emison,* 507 U.S. 25, 39–41, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (emphasis added); *see also Gingles,* 478 U.S. at 49–53, 106 S.Ct. at 2766–67; *Clark v. Calhoun County, Miss.,* 88 F.3d 1393, 1395 (5th Cir.1996).

■■■ If the *Gingles* three-part threshold is met, plaintiffs must then also show that under the "totality of the circumstances," plaintiffs do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters. *Rollins v. Fort Bend Independent School District,* 89 F.3d 1205 (5th Cir.1996); *Clark,* 88 F.3d at 1396 ("it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances"); *LULAC v. Clements,* 999 F.2d 831, 849 (5th Cir.1993) (en banc), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). To make this determination, a court must conduct a "searching practical evaluation" of the factors set forth in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub. nom., East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), and in the Senate Report of the 1982 Amendments to the Act.

The *Zimmer* factors are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S. REP. No. 417, 97th Cong., 2d. Sess., *reprinted in* 1982 U.S.C.C.A.N. 177 at 206–07; *see also Brewer v. Ham,* 876 F.2d 448, 451 n. 4 (5th Cir.1989); *Westwego,* 872 F.2d at 1204–05.

*Zimmer* and the Senate Report recognize two additional factors that may have probative value in determining whether there is a violation of the Voting Rights Act:

(1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

(2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

*Brewer*, 876 F.2d at 451 n. 4; *Westwego*, 872 F.2d at 1204–05.

■ The plaintiffs must show that "under the totality of circumstances, they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Clark*, 88 F.3d at 1395; *Westwego*, 872 F.2d at 1206. The "totality" test requires a careful evaluation of the *Gingles* as well as the *Zimmer* factors. *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1334 (5th Cir. 1989), *cert. denied*, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). In this evaluation, a court must recognize two themes that have been emphasized in similar cases: (1) courts may not tolerate political systems that effectively exclude minority voters from the democratic process; and (2) courts have rejected the notion that the Act secures to any group of citizens the right to obtain political representation in proportion to its numbers. *Williams v. City of Dallas*, 734 F.Supp. 1317, 1320 (N.D.Tex.1990).

The Fifth Circuit has made it clear that requiring race-based remedies under section 2 of the Voting Rights Act is consistent with the Supreme Court's decisions in *Miller v. Johnson*, —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), *Shaw v. Hunt*, —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), and *Bush v. Vera*, —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). *Clark*, 88 F.3d at 1402–08. In *Clark*, the Fifth Circuit stated that the three Supreme Court decisions "establish a number of important propositions. First, race-based redistricting, even that done for remedial purposes, is subject to strict scrutiny. Second, compliance with section 2 of the Voting Rights Act is a compelling governmental interest. Third, the State must have a strong basis for concluding that the three *Gingles* preconditions exist in order to claim that its redistricting plan is reasonably necessary to comply with section 2. Fourth, a tailored response to a found violation must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the wrong." *Id.* at 1405–06.

■ Section 2 of the Voting Rights Act is consistent with the Equal Protection Clause of the Fourteenth Amendment even though, by definition, the statute uses race as a basis for remedial districts. *Id. at* 1408. "Redistricting to remedy found violations of section 2 of the Voting Rights Act by definition employs race. *Miller, Shaw,* and *Bush,* ... do not foreclose the ability of States to remedy the reality of racial inequality in our political system.... The limit is that the remedy must use race at the expense of traditional political concerns no more than is reasonably necessary to remedy the found wrong." *Id.* at 1408 (internal quotations omitted). In order to establish a cause of action under the Fourteenth and Fifteenth Amendments, plaintiffs must establish that the defendants acted with a discriminatory design or purpose. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 238–42, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976).

## FINDINGS OF FACT

### I. The Parties

The individual plaintiffs—Rosalinda Perez, Dolores E. Garcia, Maggie Ramirez, Zina Gonzales, Maria Gonzales, Celestino M. Perez, Jr., Jenky M. Diaz, David R. Segura, Rudy N. Trevino, and Yvonne Ruth—are Hispanic/Mexican–American citizens of the United States who are residents of the PISD. Plaintiff Celestino Perez unsuccessfully ran for election to the Pasadena City Council, District G in 1993, Position No. 4 on the PISD Board of Trustees in 1994, and the Board of the San Jacinto Junior College District in 1995. Plaintiff, Pasadena Citizens for Equitable Representation, is an informal association comprised of the individual plaintiffs. The association lacks officers, by-laws, membership criteria, and formal organization.

The PISD is a political subdivision of the State of Texas, organized in 1889. The PISD covers approximately eighty-five square miles, located in the southwest part of Harris County, Texas, immediately southeast of Houston, Harris County, Texas. The PISD encompasses portions of the incorporated cit-

ies of Pasadena, South Houston, Houston, and unincorporated areas of Harris County, Texas. During the 1991–1992 school year, the PISD had approximately 38,671 students attending 51 schools and had approximately 4,000 employees.

From 1981 to 1994, the PISD experienced growth at an annual rate of approximately five to six percent in its average daily attendance population. According to the Texas Education Agency 1991–1992 fall survey, of the approximately 38,671 students enrolled in PISD, forty-nine percent (49%) were White/Caucasian, forty-two percent (42%) were Hispanic/Mexican–American, five percent (5%) were African–American, and four percent (4%) were "other" non-white.

The Pasadena School Board of Trustees (the "Board") is responsible for the management and governance of the PISD under TEX. EDUC. CODE ANN. §§ 23.01–23.999 (Vernon 1987 & Supp.1996). The PISD Board of Trustees is comprised of seven members, each elected at-large by voters living in the PISD. In 1992, the individual defendants— Carmen Orozco, Denny Delafield, Vickie Morgan, Bob Blair, Marshall Kendricks, Harvey Turner, and John Elam—were the elected members of the Board of Trustees of the PISD. Defendant Carmen Orozco, a Hispanic/Mexican–American, first won election to the PISD Board of Trustees in 1987. Orozco was reelected in 1990, 1993, and 1996. Orozco ran unopposed in 1996.

## II. The Background of this Lawsuit

Members of the PISD Board of Trustees are elected through an at-large system. Each of the seven PISD Trustees is elected for a staggered three-year term. Two or three positions are filled by district-wide elections each year. Each Trustee is elected by a plurality of the votes cast on a district-wide basis. Candidates run for a specific position on the Board. Each qualified voter in the PISD is entitled to vote for one candidate for each position up for election in any given year. The elections for the Board of Trustees of the PISD are non-partisan.

In 1986, the PISD Board voluntarily studied converting from the at-large system to a single-member district system of electing Trustees. The PISD Board appointed a committee to study the potential conversion and took comments from the public. One group that provided comments, the Hispanic Advisory Committee, consisted of approximately twenty to thirty members of the Hispanic community and was represented by Isaiah Torres. The PISD Board held public hearings and community meetings regarding the adoption of a single-member district election system. The Board retained a demographer, Bobby Bowers, who drew district election lines for proposed single-member districts. The PISD Board adopted a "5–2 plan" using Bowers' district lines and submitted the plan to the United States Department of Justice for preclearance, to use by January 1987. The plan did not receive support from the Hispanic community or from the community at large.[2] The Hispanic Advisory Committee opposed the plan on the grounds that the plan divided the Hispanic community and did not take into account the Hispanic growth rate. The Department of Justice declined to preclear the 1986 proposed 5–2 plan. The PISD Board withdrew the proposed plan and rescinded its order adopting the 5–2 plan.

On November 19, 1992, plaintiffs filed this suit, claiming that Hispanics do not have an equal opportunity to participate in the political process and to elect to the PISD Board candidates of their choice, because of the at-large election system; the use of staggered terms and the numbered post system which eliminate single-shot voting; the large population of the district; the comparatively small number of polling places; the absence of minorities as election officials; and the economic differences between the Anglo and minority communities. Plaintiffs ask this court to require the PISD to change the method of electing Trustees from the at-large system to a single-member district system.

The PISD Board of Trustees voted unanimously to defend this lawsuit.

2. Pls. Ex. 17.

## III. The Fact and Expert Witnesses

Plaintiffs offered the testimony of Dr. Henry Flores as an expert in statistical analysis. Dr. Flores holds B.A., M.A., and Ph.D. degrees in political science, and is the chair of the Department of Political Science at St. Mary's University in San Antonio, Texas. Plaintiffs also offered the testimony of George Korbel as an expert witness on the *Gingles* threshold, as well as on the *Zimmer* factors. Korbel holds a B.A. degree in government and philosophy and a J.D. degree from the University of Minnesota. Since 1981, Korbel has worked as a litigation coordinator for Texas Rural Legal Aid, Inc. Korbel is a recognized voting rights expert, whose focus is on the non-statistical analysis of elections and the factors that influence their outcome. Plaintiffs also offered the testimony of John E. Castillo ("Castillo"), who has experience as a political consultant, is familiar with the demographics of South Houston and Pasadena, and has worked on redistricting plans for municipal elections in Houston. Mr. Castillo provided estimates as to the numbers of Hispanics of voting age living in the PISD.

At the February 10, 1997 hearing, plaintiffs offered the testimony of Dr. Tatcho Mindiola, Jr. as an expert on the first *Gingles* threshold. Dr. Mindiola updated the demographic projections offered by Mr. Korbel in the 1995 trial, using Mr. Korbel's methodology. Dr. Mindiola holds a Bachelor of Business Administration and M.A. and Ph.D. degrees in sociology. Dr. Mindiola is an associate professor of sociology at the University of Houston and director of the University of Houston Center for Mexican American Studies.

Defendants offered the testimony of Dr. John Alford as an expert in statistical analysis, to explain the significance of the voting patterns and to examine population growth trends. Dr. Alford holds B.S., M.A., and Ph.D. degrees in political science and an M.P.A. in public administration. He is an associate professor at Rice University.

The court finds that Drs. Flores, Mindiola, and Alford are experts in the field of statistical analysis; that Drs. Flores and Alford are experts in applying statistical analysis to issues raised by election districts; and that Mr. Korbel is an expert in the field of non-statistical voting rights analysis. Mr. Castillo is a fact witness regarding elections in the South Houston and Pasadena areas.

## IV. The First *Gingles* Factor

The threshold question is whether it is possible to draw one or more majority-minority districts in the PISD. Drawing majority-minority districts requires a minority population that is of sufficient size and compactness [3] to allow the construction of a compact and contiguous district in which the minority group can form an effective voting majority.

### A. The 1990 Census: Distribution of Hispanic Voting–Age Population in the PISD

According to the 1990 United States Census of Population, the PISD had 187,047 residents, of whom 62.07 percent are Anglo (116,104); 30.22 percent are Hispanic (56,529); 3.94 percent are African–American (7,371); and 3.74–.77 percent are "other" (7,003). The voting-age population of the PISD according to the 1990 census is 131,405, of whom 66.84 percent are Anglo (87,824); 26.06 percent are Hispanic (34,247); 3.56 percent are African–American (4,671); and 3.56 percent are "other" (4,675).

The 1990 census population and voting-age population ("VAP") figures and percentages are reflected in the following table: [4]

---

3. *Cf. Houston v. Lafayette County,* 56 F.3d 606, 611 (5th Cir.1995) (a court should "focus[] on the size and concentration of the minority population, rather than only on the shape of the districts in the plaintiff residents' specific proposals").

4. *See* charts I and II in the appendix to this memorandum and opinion.

|  | PISD POPULATION | | PISD VAP | |
| --- | --- | --- | --- | --- |
|  | Number of Residents | Percentage of PISD Population | Number of Residents | Percentage of PISD Population |
| Anglo | 116,104 | 62.07% | 87,824 | 66.84% |
| Hispanic | 56,529 | 30.22% | 34,247 | 26.06% |
| African-American | 7,371 | 3.94% | 4,671 | 3.56% |
| "Other" | 7,003 | 3.74–3.77% | 4,675 | 3.56% |
| Total | 187,047 | 100% | 131,405 | 100% |

There are only four polling places in the PISD for Board elections. The polling places are located at Pasadena High School, Sam Rayburn High School, South Houston High School, and J. Frank Dobie High School. The geographic attendance zones for each of the four schools serve as the boundary lines for each polling place. The population and voting data for the 1986 through 1997 elections is grouped by the four polling places.

For the 1987–1994 elections, the areas served by the four polling places show the following distribution of Hispanic voting-age population:

| POLLING PLACE | HISPANIC PERCENTAGE OF VAP IN EACH POLLING PLACE |
| --- | --- |
| Pasadena High School | 35.33% |
| South Houston High School | 30.97% |
| Rayburn High School | 20.80% |
| Dobie High School | 15.36% |

### B. The Proposed Single–Member District Plans

In this lawsuit, plaintiffs argue that it is possible to develop a plan for seven single-member districts using 1990 census data (the "Korbel Plan"). Under this plan, in proposed District 1, 55.07 percent of the voting-age population would be Hispanic and in proposed District 6, 50.04 percent of the voting-age population would be Hispanic.[5] The Korbel Plan does not take into account the citizenship of the voting-age Hispanics; projected population growth trends in the Hispanic community; or a possible undercount of Hispanics in the 1990 census. The Korbel Plan was not intended as a specific "remedy district," but was offered to show the feasibility of developing a single-member district plan meeting the first *Gingles* requirement.

Plaintiffs also presented a proposed plan for five single-member districts and two at-large districts (the "5–2 Plan D"). The 5–2 Plan D did not take into account the citizenship of the voting-age Hispanics; projected population growth trends in the Hispanic community; or a possible undercount of Hispanics in the 1990 census. The 5–2 Plan D contained one district, (District 1), consisting of 51.9 percent total Hispanic population and 46.0 percent Hispanic voting-age population, and another district, (District 2), consisting of 47.0 percent total Hispanic population and 41.9 percent Hispanic voting-age population.[6] Districts 1 and 2 of the 5–2 Plan are similar in location and configuration to the two proposed Hispanic–majority districts in the Korbel Plan. No projections of the populations of the districts in the 5–2 Plan D were presented.

5. Pls. Ex. 1A.

6. Pls. Ex. 2A.

**1206**

In 1994, a PISD–retained demographer, Leslie Johnston ("Johnston"), developed a plan for seven single-member districts (the "Johnston Plan"), also using 1990 census data. The Johnston Plan contained one district, (District 1), consisting of a total Hispanic population of 58.4 percent and a Hispanic voting-age population of 52.5 percent, and a second district, (District 2), made up of a total Hispanic population of 49.2 percent and a Hispanic voting-age population of 44.0 percent.[7]

Johnston also developed two plans with seven single-member districts, each showing one district of over 50 percent Hispanic voting-age population.[8] "Plan A" included one district, (District 1), with a Hispanic population of 58.8 percent and a Hispanic voting-age population of 52.9 percent and another district, (District 2), with a Hispanic population of 50.3 percent and a Hispanic voting-age population of 45.2 percent. "Plan B" contained one district, (District 1), consisting of a Hispanic population of 58.6 percent and a Hispanic voting-age population of 52.7 percent and another district, (District 2), consisting of a Hispanic population of 48.9 percent and a Hispanic voting-age population of 43.8

percent. The Johnston Plan did not take into account the citizenship of the Hispanic voting-age population in the district; population growth estimates; or a possible undercount of Hispanics in the 1990 census figures.

Between 1980 and 1990, the total Hispanic population in the PISD increased by 80.55 percent (25,131); the total African–American population increased by 90.79 percent (3,146); and the total Anglo population decreased by 16.16 percent (–22,212).[9] This represents an eight percent annualized increase in the total Hispanic population and a one to two percent annualized decrease in the Anglo population of the PISD from 1980 to 1990. At each of the four high schools within PISD, the percentage of Hispanic students grew and the percentage of Anglo students dropped from 1981 to 1994.[10]

Plaintiffs presented evidence that the application of simple annualized growth rates of 8 percent for Hispanics, 9 percent for African–Americans, and negative 1 to 1.5 percent for Anglos, results in the following voting-age population ("VAP") projection estimates for the proposed single-member districts:

7.  Pls. Ex. 3, p. 4.

8.  Pls. Ex. 24.

9.  Pls. Exs. 52, 41. The 1980 U.S. Census of Population estimated a PISD population of 177,287 residents, contrasting with the 1990 census estimate 187,047. Korbel testified that the 1980 census estimated that 17.6 percent of the PISD was Mexican American; 2.3 percent was African–American; and just under 80 percent was Anglo.

10.  Pls. Ex. 40.

<u>Korbel Plan</u> [11]

| HISPANIC POPULATION MEASURED | DISTRICT 1 | DISTRICT 6 |
|---|---|---|
| 1990 VAP | 55.07% | 50.04% |
| 1990 CITIZEN VAP | Not Available | Not Available |
| 1995 VAP* | 64.63% | 58.50% |
| 1995 CITIZEN VAP* | 55.92% | 47.48% |
| 1996 VAP* | 66.21% | 59.90% |
| 1996 CITIZEN VAP* | 57.11% | 48.96% |
| 1997 VAP* | 67.68% | 61.22% |
| 1997 CITIZEN VAP* | 58.40% | .50.21% |
| 1998 VAP* | 69.08% | 62.47% |
| 1998 CITIZEN VAP* | 60.00% | 51.57% |

* denotes projections.

<u>Johnston Plan</u> [12]

| HISPANIC POPULATION MEASURED | DISTRICT 1 | DISTRICT 2 |
|---|---|---|
| 1990 VAP | 52.48% | 44.01% |
| 1990 CITIZEN VAP | Not Available | Not Available |
| 1995 VAP* | 60.85% | 38.90% |
| 1995 CITIZEN VAP* | 52.89% | 29.80% |
| 1996 VAP* | 62.56% | 41.14% |
| 1996 CITIZEN VAP* | 54.68% | 31.08% |

* denotes projections.

<u>Plan A</u> [13]

| HISPANIC POPULATION MEASURED | DISTRICT 1 | DISTRICT 2 |
|---|---|---|
| 1990 VAP | 52.94% | 46.38% |
| 1990 CITIZEN VAP | Not Available | Not Available |
| 1995 VAP* | 62.67% | 54.43% |
| 1995 CITIZEN VAP* | 54.81% | 44.33% |
| 1996 VAP* | 64.27% | 55.73% |
| 1996 CITIZEN VAP* | 56.50% | 45.63% |

* denotes projections.

11. Pls. Exs. 1A, 52, 75 and 76.

12. Pls. Exs. 3 and 56.

13. Pls. Exs. 24 and 56.

Plan B [14]

| HISPANIC POPULATION MEASURED | DISTRICT 1 | DISTRICT 2 |
|---|---|---|
| 1990 VAP | 52.74% | 43.77% |
| 1990 CITIZEN VAP | Not Available | Not Available |
| 1995 VAP* | 62.49% | 51.91% |
| 1995 CITIZEN VAP* | 54.61% | 41.84% |
| 1996 VAP* | 64.09% | 53.24% |
| 1996 CITIZEN VAP* | 56.31% | 43.15% |

* denotes projections.

---

### C. *Gingles* I: A Sufficiently Large and Compact Group of *Voting–Age Citizens*

Plaintiffs argue that to satisfy the first of the *Gingles* threshold requirements, they need only establish that it is possible to create one single-member district in which the majority of the voting-age population is Hispanic. Defendants contend that plaintiffs must establish that the Hispanic community in the PISD is sufficiently large and geographically compact to create a single-member district in which the majority of voting-age *citizens* would be Hispanic.

The majority of courts addressing this issue have held that a plaintiff must establish that it is possible to create a district with a majority of minority voting-age *citizens*. *McNeil v. Springfield Park District*, 851 F.2d 937, 944–45 (7th Cir.1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989); *Dickinson v. Indiana State Election Board*, 933 F.2d 497, 503 (7th Cir.1991) ("a simple majority of eligible voters in the single-member district"); *Romero v. City of Pomona*, 665 F.Supp. 853, 854 (C.D.Cal.1987), *aff'd*, 883 F.2d 1418, 1425–26 (9th Cir.1989) (stating that *Gingles* refers to effective voting majorities, rather than raw population totals, as the touchstone for determining geographical compactness); *Morris v. City of Houston*, 894 F.Supp. 1062, 1065 (S.D.Tex.1995) ("using data of voting age Hispanic citizens is the correct measure of

the Hispanic population's ability to create a majority voting district") (appeal pending, No. 95–20740, oral argument heard on 9/30/96); *Milwaukee Branch of the NAACP v. Thompson*, 929 F.Supp. 1150 (E.D.Wis. 1996) ("citizenship rates can be taken into account in resolving the issue whether a plaintiff has satisfied the first *Gingles* condition[; i]ndividuals who are not citizens are not eligible voters[; t]hose ineligible to vote are not among those whose votes have been diluted within the meaning of section 2"); *Skorepa v. City of Chula Vista*, 723 F.Supp. 1384, 1388–89 (S.D.Cal.1989); *contra LULAC v. North East ISD*, 903 F.Supp. 1071, 1084 (W.D.Tex.1995).

*Gingles* I requires a showing of a group of voting-age citizens sufficiently large and geographically compact to constitute a majority in the single-member district. This requirement is in harmony with the language of section 2 of the Voting Rights Act. The Act forbids voting qualifications, prerequisites, standards, practices, and procedures which "are not open to participation by members of a class of *citizens* ... in that its members have less opportunity than other members of the electorate to participate in the political process," and which result "in a denial or abridgement of the right of any *citizen* of the United States." 42 U.S.C. § 1973 (emphasis added). The Supreme Court in *Gingles* emphasized that "[u]nless minority *voters* possess the potential to elect representatives in the absence of the challenged structure or

---

14. Pls. Exs. 24 and 56.

practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 51 n. 17, 106 S.Ct. at 2767 n. 17 (emphasis added); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). Because non-citizens are not eligible to vote, they "have not experienced a dilution of their vote." *McNeil*, 851 F.2d at 944–45. *Gingles* requires a showing based on individuals of voting age to assure that those individuals are voting-eligible. To require citizenship does not add to the requirements already imposed by *Gingles*.

This court concludes that plaintiffs must demonstrate that it is feasible to draw a geographically compact district in which Hispanics comprise the majority of voting-age citizens.

### D. *Gingles* I: 1990 Census Figures on Hispanic Voting–Age Citizens

■ The census does not report the number of citizens by race or ethnicity at the block or tract level, as it does for voting-age population. Hispanic voting-age citizenship rates, however, can be estimated by using regression analysis to compare the Hispanic population with citizenship rates.

Regression is a mathematical technique used for estimating the best fitting straight line that could be drawn to describe the relationship between two variables in a scatter plot. In a two-variable regression, R is the same as a Pearson's r or correlation coefficient. R indicates the degree of linear association between the two variables examined. The R range is 0 to 1.0, positive or negative. $R^2$ describes how tightly the actual data points cluster around the regression

line. It is the proportion of variation in the dependent variable that is explained or accounted for by the independent variable. The $R^2$ ranges from 0 to 1.0, but is always positive.

The application of the regression analysis to the 1990 census reveals that approximately 60 percent of the voting-age Hispanics in the PISD are citizens.[15] An independent estimate, based on survey data gathered by a national Hispanic political organization, reported a 54 percent adult Hispanic citizenship rate for the Houston area.[16] Assuming a 60 percent citizenship rate for voting-age Hispanics in the PISD, a district must have a Hispanic voting-age population of at least 62.5 percent[17] to produce a district with a 50 percent Hispanic citizen voting-age population.

Using the 1990 census data, none of the districts in the proposed plans has a Hispanic voting-age population of at least 62.5 percent, or a citizen voting-age population of at least 50 percent. The Korbel Plan District 1 has the highest 1990 Hispanic voting-age population, at 55.07 percent. The parties appear to concede that the 1990 Hispanic citizen voting-age population is not sufficient for *Gingles* I.

The Korbel Plan proposed districts are irregularly shaped, evidencing a lack of geographic compactness. Dr. Alford testified that the Korbel Plan districts were irregular in shape; there were "fingers" extending out of the Korbel Plan districts, with many intrusions only a block wide in size. Dr. Alford testified that this did not appear justified as an attempt to recognize neighborhood boundaries or existing precincts, and was instead an effort to include as many Hispanics as possible given the dispersed residential pat-

**15.** Dr. Alford testified that the regression analysis conducted provides an estimate with a 95 percent confidence interval of ±8. Given the 95 percent confidence interval of ±8, it is 95 percent certain that the true citizenship rate is between 52 percent and 68 percent. Korbel testified that the information used to determine citizenship population was available only on the "block group" level. A block group is composed of several city blocks. Korbel's proposed districts are based on block data, not block group data. The citizenship figures used by Dr. Alford require projecting group level

data onto smaller areas, which compromises reliability.

**16.** (Docket Entry No. 133, p. 5).

**17.** The lower bound estimate of 52 percent citizenship, based on the 95 percent confidence interval, yields a 66 percent required Hispanic voting-age population to achieve an eligible majority. The upper bound estimate of 68 percent yields a 60 percent required Hispanic voting-age population.

terns in the PISD. Korbel did not refute the irregular shape of the proposed districts, but explained that they were not intended as remedy districts. Even if the proposed single-member districts are not "remedy" districts, they must demonstrate the feasibility of drawing single-member districts with similar population sizes and compact shapes. To determine compactness, one "creates hypothetical ideal districts (*i.e.*, districts that contain precisely the same number of people) and then determines, in percentage terms, the degree of deviation between each of the actual districts and the ideal one. The maximum deviation is calculated by adding the percentage points that the largest district is above the ideal, to the percentage points the smallest is below." *Garza v. County of Los Angeles*, 918 F.2d 763, 785 (9th Cir.1990) (Kozinski, J., concurring in part, dissenting in part), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991); *citing Brown v. Thomson*, 462 U.S. 835, 838–39, 103 S.Ct. 2690, 2694, 77 L.Ed.2d 214 (1983). In order not to violate the one man one vote principle, the maximum deviation from the smallest to the largest district should not exceed 10 percent. Dr. Alford testified that the Korbel Plan had a population deviation of approximately 32 percent.[18] Korbel did not refute this testimony.

The proposed districts are flawed by a citizenship population of less than 50 percent, a population deviation of over 10 percent, and irregular shapes.[19] Using the 1990 census data, plaintiffs fail to prove that it is feasible to create one or more districts in which a majority of voting-age citizens are Hispanic.

### E. *Gingles* I and Projected Population Trends

Because plaintiffs cannot satisfy *Gingles* I using the 1990 census data, they ask this court to determine the feasibility of creating a majority-minority district using projected estimates for the 1995 through 1998 Hispanic voting-age and citizen voting-age population in the PISD.

■■■ A court is not confined to United States census data in deciding whether a sufficiently large and geographically compact majority-minority single-member district can be created to satisfy *Gingles* I. *Kirkpatrick v. Preisler*, 394 U.S. 526, 534–36, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519 (1969); *Garza*, 918 F.2d at 772–73;[20] *Dixon v. Hassler*, 412 F.Supp. 1036, 1040 (W.D.Tenn.), *aff'd*, 429 U.S. 934, 97 S.Ct. 346, 50 L.Ed.2d 303 (1976); *see also Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1045–46 n. 3 (5th Cir.1990). However, the census figures are presumed accurate until proven otherwise. *McNeil*, 851 F.2d at 946. Proof of changed figures must be "thoroughly documented," have a high degree of accuracy, and be "clear, cogent and convincing" to override the presumptive correctness of the prior decennial census. *McNeil*, 851 F.2d at 946; *Kirkpatrick*, 394 U.S. at 534–36, 89 S.Ct. at 1231; *Dixon*, 412 F.Supp. at 1040; *Graves v. Barnes*, 446 F.Supp. 560, 568 (W.D.Tex. 1977), *aff'd*, 435 U.S. 901, 98 S.Ct. 1444, 55 L.Ed.2d 492 (1978); *see also Dickinson*, 933 F.2d at 503. Federal census data must be used unless there is more reliable data. *McNeil*, 851 F.2d at 946; *Skorepa*, 723 F.Supp. at 1390. "Estimates based on past trends are generally not sufficient to override 'hard' decennial census data." *McNeil*, 851 F.2d at 946.

### 1. Reliability Problems in the 1990 Census

Korbel testified that minorities were undercounted in the 1990 census by approxi-

---

**18.** The other single-member district plans proposed by plaintiffs suffered from greater population deviations than the Korbel Plan.

**19.** Defs. Ex. 101; Pls. Ex. 1.

**20.** In *Garza v. County of Los Angeles*, the court allowed the use of projections "where ... the census data is almost a decade old and therefore no longer reliable." 918 F.2d 763, 773 (9th Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). The court discussed *McNeil v. Springfield Park District*, 851 F.2d 937, 946 (7th Cir.1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989), and stated that it saw "no reason to impose this [*McNeil*] high standard in a case where intentional discrimination has been proved, and the data is merely to be used in fashioning a remedy." *Garza*, 918 F.2d at 773 n. 3. In this case, this court has not found intentional discrimination and must use the population data to determine whether the *Gingles* prerequisites are met, not only to fashion a remedy.

mately ten percent in Harris County. The concern over the undercount has been reviewed by federal courts. The issue is whether the asserted undercount of Hispanic voters is supported by "concrete evidence" sufficient to override the presumption of accuracy given the census data. *Skorepa*, 723 F.Supp. at 1390; *Cuomo v. Baldrige*, 674 F.Supp. 1089, 1104–05 (S.D.N.Y.1987). In *Wisconsin v. City of New York*, —— U.S. ——, 116 S.Ct. 1091, 134 L.Ed.2d 167 (1996), the Supreme Court discussed at length the concern over "a net undercount of the actual American population in every decennial census," stated that the 1990 census was "successful in counting 98.4% of the population," and held that it was reasonable for the Secretary of Commerce to conclude that the "actual enumeration" mandated by the Constitution could best be achieved in the 1990 census without the postenumeration survey statistical adjustment designed to correct an undercount in the initial enumeration.

This court finds the alleged undercount to be an insufficient basis for rejecting the 1990 census as unreliable and for requiring estimates projecting population growth in the proposed districts. Plaintiffs offered no evidence as to any specific effect of the alleged undercount on the size of the Hispanic adult citizen population, or on the non-Hispanic population, in any of the proposed or actual districts. Dr. Alford noted that both Hispanics and non-Hispanics could have been undercounted, and that noncitizen Hispanics could well constitute the majority of those not counted. Plaintiffs have not cited any case in which a court has rejected the census figures in a voting rights case based on an alleged undercount. To the contrary, several courts have rejected such a claim for lack of evidence that the undercount made the original census count insufficiently reliable. *See, e.g., Skorepa*, 723 F.Supp. at 1390; *Cuomo*, 674 F.Supp. at 1104–05.

Common sense, as well as the expert testimony, teaches that the further away in time one moves from the census, the less reliable it becomes. However, Drs. Alford and Mindiola agreed that the further away one moves from the census, population projections based on the census also become more unre-

liable. The parties, and their experts, agree that the 1990 census count of the Hispanic voting-age population in the relevant area is outdated. The experts agree that the population has grown. The experts disagree as to whether the estimated projections of that growth in the proposed single-member districts in the PISD are more reliable than the 1990 census count.

### 2. Reliability Problems in the 1997–98 Projections

The plaintiffs' experts used a decennially-compounded "straight-line" estimate to make their population projections. Plaintiffs' experts calculated the total growth rate between 1980 and 1990, then annualized it and used a straight-line growth rate between 1980 and 1990. In 1990, plaintiffs changed the population base used from the 1980 population to the 1990 population, adding the 1980–1990 population growth to the new 1990 base. Between 1990 and 2000, plaintiffs again used a straight-line growth rate. Dr. Alford testified that plaintiffs' linear progression was not a single straight-line estimate between 1980 and 2000, but two straight lines connected in 1990. The 1990–2000 straight line has a steeper slope than the 1980–1990 straight line.

Dr. Alford testified that the decennially compounded straight-line estimate for population growth, which plaintiffs' experts used to calculate the projected Hispanic population in the proposed districts, is overly simplified and wholly unreliable as a measure of the 1997 Hispanic voting-age citizenship population. Other factors must also be taken into account, such as age cohorts, birth and death rates, in- and out-migration, and absolute limiting factors, such as housing availability in a particular geographic area. Dr. Mindiola agreed that linear progressions had shortcomings in terms of accuracy, but were simple, easy to calculate, and more practical than extensive surveys.

Courts have recognized that demography is complex. Courts have rejected overly simplistic, "crude" analyses that are easy and inexpensive to calculate but too inaccurate to serve as a basis for changing the basis of conducting elections. *Dixon*, 412 F.Supp. at 1041; *see also Kirkpatrick*, 394 U.S. at 534–

36, 89 S.Ct. at 1231; *see also McNeil*, 851 F.2d at 946. In *Dixon*, the court noted that other factors must be taken into account to provide reliable projections, such as population density and land area; current information on the area with respect to listed telephones and registered automobiles; and an area's housing type, housing value, income and age of people, and family structure. 412 F.Supp. at 1041.

Dr. Mindiola testified that the straight-line method used by plaintiffs results in "conservative" population projections, for voting-age populations as well as for citizen voting-age populations. Dr. Mindiola stated that the Hispanic population was growing at a faster rate than the straight-line projection reflected. However, Dr. Mindiola could not identify for this court the basis for this estimate of the Hispanic population growth rate, citing the need for extensive surveys.

Dr. Mindiola assumed a high growth rate for the entire Hispanic population in the PISD, but could not identify a growth rate for Hispanic citizens in the proposed districts. Dr. Mindiola agreed with Dr. Alford that the citizenship rate applied to his projections would be lower if the non-citizen growth rate were greater than the citizen growth rate. Dr. Alford testified that the Hispanic citizenship rate was not constant but rather decreased during the 1990s, in part due to an increase in illegal immigration.

Dr. Alford testified that simply applying the 1980–1990 growth rate to project the 1996, 1997, and 1998 populations, as plaintiffs did, leads to unreliable results. Dr. Alford supported his concern with specific evidence in the record. If the plaintiffs' population growth projections were accurate, the percentage of Hispanics voting in the PISD and exogenous elections would have increased; instead, the percentage remained essentially unchanged. If the plaintiffs' projections were accurate, Democrats, consistently favored by the Hispanic voters in the PISD, would have shown an increase in votes received over time; instead, the number of votes cast for Democratic candidates by voters in the PISD was stable. Dr. Alford testified that Hispanic voter registration did increase during the 1990s, but not at the rate that would be expected if plaintiffs' Hispanic citizen growth projections were accurate.[21]

Dr. Alford testified that the increase in Hispanic voter registration is consistent with the presence of growth in the Hispanic voting-age citizen population since the 1990 census. However, the likely rate of that growth does not approach the rate plaintiffs project. Dr. Alford testified that population projections are generally highly sensitive to assumptions and prone to error, and not simply "straight line." Dr. Alford testified that the 1990 census was the best estimate of the PISD populations, despite the passage of time.

This court finds that there is no credible evidence that plaintiffs' straight-line projections for growth in the Hispanic citizen voting-age population in the PISD are sufficiently reliable for the purpose of the *Gingles* analysis.

### 3. The Least Unreliable Alternative

This court is faced with a Hobson's choice between two unsatisfactory alternatives. The midpoint on the census cycle is passed. The 1990 census is recognized as inaccurate to a certain extent. However, the only estimates of the extent to which it is unreliable, and the only estimates of the current population, are estimates that are also unreliable. The choice is between an outdated actual count and an estimated projection based in part on that count and in part on assumptions and arithmetic.

In *McNeil*, the Seventh Circuit addressed a similar situation. 851 F.2d 937. In that case, decided in July 1988, the 1980 census "indicated a minority voting age population of roughly 43 %." *Id.* at 945. The plaintiffs-appellants "rel[ied] on their expert's demographic analysis [to] estimat[e] a minority population of 56% in the proposed district as of 1987." *Id.* The appellants quoted *Gaffney*

---

**21.** The sign-in sheets for the PISD elections showed that in 1987, 7.6 percent of those voting had Spanish surnames; in 1989, the figure was 4.3 percent; in 1990, the figure was 10.7 percent; in 1993, the figure was 6.3 percent; in 1994, the figure was 7.5 percent; and in 1995, the figure was 6.0 percent. Defs. Ex. 116.

*v. Cummings,* 412 U.S. 735, 745–47, 93 S.Ct. 2321, 2328, 37 L.Ed.2d 298 (1973), in which the Supreme Court stated in *dicta* that:

> it must be recognized that total population, even if absolutely accurate as to each district when counted, is nevertheless not a talismanic measure of the weight of a person's vote under a later-adopted reapportionment plan. The United States census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down. Substantial differentials in population growth rates are striking and well-known phenomena.

The *McNeil* court agreed with the appellants that, "[w]ith a mobile population, the demographic facts may always be a bit stale." *McNeil,* 851 F.2d at 945. However, the court found that the appellants' argument and the *Gaffney dicta* suggested only that "census data may not accurately reflect present population." *Id.* at 946. The argument did not "require courts to use a different talisman." *Id.* The court stated that it would depart from the census and its presumption of accuracy only if the "proof of changed figures" was "clear and convincing." *Id.* The court also stated that "[i]n the present state of the demographic art, estimates based on past trends are generally not sufficient to override 'hard' decennial census data.... [P]opulations change constantly and kinks in the data are common." *Id.* The court ultimately held that it would use the census figure of 46 percent for the minority voting age population, but added that "if the plaintiffs' view of the population trends is correct, they will have a good claim based on the 1990 census." *Id.*

This court finds Dr. Alford's testimony and criticisms of plaintiffs' population projections to be credible. Although plaintiffs' projections may have been cost-effective and simple

to calculate, they are unreliable estimates that offer only "a talismanic measure" of the population. *See McNeil,* 851 F.2d at 945–46 ("in July 1988, the court relied on the 1980 census because it found that 'the meager [projection] evidence' before [it could not] override the presumption of census accuracy"); *see also Graves,* 446 F.Supp. at 568 (in October 1977, the court relied on the 1970 census rather than the plaintiffs' projections because it found "several scientific defects" in plaintiffs' method of projection); *see also Skorepa,* 723 F.Supp. at 1390 (in October 1989, the court used the 1980 census data because the projection estimates offered by plaintiffs were "not based on the kind of concrete evidence necessary to override the presumption of accuracy of the census data").

This court does not find the projected population growth estimated by plaintiffs to be sufficiently reliable to overcome the presumption of census accuracy. If the plaintiffs' estimate of the population trends is correct, like the plaintiffs-appellants in *McNeil,* the plaintiffs in this case may have a stronger argument based on the 2000 census. However, using the 1990 census, the most reliable estimate available to this court, plaintiffs fail to meet *Gingles* I.

## V. The Second and Third *Gingles* Factors [22]

### A. Analysis of PISD Board Elections

From 1987 [23] to 1997, there have been twelve contested races for the Board of Trustees of the PISD. Three of those elections involved head-to-head contests. Two of those three head-to-head contests involved a minority candidate. The thrust of plaintiffs' claim is that white bloc voting defeats the preferred candidate of the minority community unless there are "special circumstances" present.

---

**22.** Although this court finds that plaintiffs cannot make the required showing under *Gingles* I, in order to present a complete analysis, the court also examines *Gingles* II and III and the *Zimmer* factors.

**23.** The first Hispanic candidate ran for a PISD Board position in 1987.

A breakdown of the results of the PISD elections with Hispanic candidates between 1987 and 1997 is summarized below: [24]

| YEAR (POS.) | CANDIDATE (* incumbent) | RACE | VOTES | PERCENTAGE OF VOTES RECEIVED IN: | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | TOTAL | PASADENA | S.HOUSTON | RAYBURN | DOBIE |
| 1987(2) | Orozco | H | 2,428 | 45.10% | 45.93% | 49.33% | 57.22% | 21.79% |
| | Stokes | W | 1,164 | | | | | |
| | Seiler | W | 1,137 | | | | | |
| | Blumrick | W | 654 | | | | | |
| | Total Votes Cast: | | 5,383 | 100% | 100% | 100% | 100% | 100% |
| 1987(3) | Elam | W | 3,293 | 61.29% | 68.96% | 57.89% | 73.21% | 35.85% |
| | Garner * | W | 1,694 | | | | | |
| | Valdez | H | 386 | 7.18% | 4.87% | 8.63% | 7.12% | 9.28% |
| | Total Votes Cast: | | 5,373 | 100% | 100% | 100% | 100% | 100% |
| 1988(5) | Blair | W | 1,840 | 51.22% | 66.04% | 35.94% | 71.07% | 19.09% |
| | Robinson | W | 952 | | | | | |
| | Razo | H | 522 | 14.53% | 10.63% | 47.03% | 9.95% | 4.66% |
| | Early | W | 278 | | | | | |
| | Total Votes Cast: | | 3,592 | 100% | 100% | 100% | 100% | 100% |
| 1989(6) | Kendrick | W | 2,077 | 88.05% | 90.51% | 83.72% | 92.30% | 69.03% |
| | Garvey–Montanez | H | 196 | 8.31% | 5.53% | 13.95% | 4.13% | 23.51% |
| | Kowis | W | 49 | | | | | |
| | Rudd | W | 37 | | | | | |
| | Total Votes Cast: | | 2,359 | 100% | 100% | 100% | 100% | 100% |
| 1990(2) | Orozco | H | 643 | 81.9% | 78.61% | 90.23% | 74.75% | 85.42% |
| | Jackson | W | 149 | | | | | |
| | Total Votes Cast: | | 792 | 100% | 100% | 100% | 100% | 100% |
| 1993(1) | Roberts | W | 3,393 | 53.41% | 49.53% | 45.39% | 48.45% | 61.71% |
| | Graham | W | 1,508 | | | | | |
| | Briscoe | W | 1,249 | | | | | |
| | Gutierrez | H | 203 | 3.20% | 3.68% | 4.16% | 2.90% | 2.18% |
| | Total Votes Cast: | | 6,353 | 100% | 100% | 100% | 100% | 100% |
| 1993(2) | Orozco * | H | 4,383 | 68.26% | 68.97% | 61.04% | 68.23% | 66.26% |
| | Maxwell | W | 2,038 | | | | | |
| | Total Votes Cast: | | 6,421 | 100% | 100% | 100% | 100% | 100% |
| 1993(3) | N. Sullivan | W | 3,984 | 63.14% | 65.65% | 53.59% | 62.94% | 61.50% |
| | Andrews | W | 1,794 | | | | | |
| | Leatherman | W | 246 | | | | | |
| | Heil | W | 168 | | | | | |
| | Garcia | H | 118 | 1.87% | 1.82% | 2.59% | 1.09% | 2.26% |
| | Crawford | W | 54 | | | | | |
| | Total Votes Cast: | | 6,310 | 100% | 100% | 100% | 100% | 100% |
| 1994(4) | T. Sullivan | W | 2,105 | 58.36% | 54.79% | 60.54% | 57.12% | 50.39% |
| | Jordan | W | 994 | | | | | |
| | Castillo | H | 247 | 10.98% together | 13.74% together | 11.07% together | 9.38% together | 14.64% together |
| | Perez | H | 149 | | | | | |
| | Filberth | W | 65 | | | | | |
| | Evans | W | 47 | | | | | |
| | Total Votes Cast: | | 3,607 | 100% | 100% | 100% | 100% | 100% |
| 1994(5) | Blair * | W | 1,998 | 55.59% | 57.60% | 56.73% | 61.69% | 31.28% |
| | McClain | W | 584 | | | | | |
| | Bennett | W | 534 | | | | | |
| | Briscoe | W | 264 | | | | | |
| | Segura | H | 214 | 5.95% | 10.40% | 5.57% | 4.23% | 7.05% |
| | Total Votes Cast: | | 3,594 | 100% | 100% | 100% | 100% | 100% |
| 1997(5) | Blair * | W | 1,243 | 71.81% | 84.69% | 75.74% | 82.67% | 64.67% |
| | Phillips | W | 250 | | | | | |
| | Gonzales | H | 129 | 7.45% | 6.63% | 10.66% | 6.10% | 10.67% |
| | Total Votes Cast: | | 1,731 | 100% | 100% | 100% | 100% | 100% |

Both sides used regression analysis to determine whether there is a pattern of voting preferences in the PISD elections. *Rollins,* 89 F.3d at 1210 (the Supreme Court and the Fifth Circuit have approved the use of statistical analysis to evaluate racially polarized voting). Drs. Flores and Alford often agreed on the results of applying the statistical techniques to the elections. They disagreed as to the legal significance of the regression analysis results they produced. The regression analyses are one factor that this court examines in determining whether the second and third prongs of the *Gingles* test are met and

24. Pls. Exs. 27–39, 70–73; *see also* chart III in appendix to this memorandum and opinion.

whether the *Zimmer* factors evidence a section 2 violation. They are, however, only one factor among the "totality of the circumstances" that this court must examine.

Regression analyses in a voting rights case compare the density of a particular population group in a specified area with the percentage of votes received by a particular candidate in that area. *See Houston v. Lafayette County*, 56 F.3d 606, 609 n. 1 (5th Cir.1995); *see also Teague v. Attala County*, 92 F.3d 283, 285 (5th Cir.1996) ("[e]cological regression analysis explains how voting and turnout correspond to the proportions of whites and [minorities] in each voting precinct"). In this case, the regression analysis examines to what extent the vote for a Hispanic candidate increases as the concentration of Hispanic voters in the precinct increases. The coefficients for the y-intercept and for the slope form the equation of the actual regression line. The y-intercept defines the point at which the regression line crosses the vertical axis, giving the predicted value of the votes cast for the Hispanic candidate (the dependent variable) when the percentage of the Hispanic voting-age population (the independent variable) is zero. The slope indicates the rise of the regression line, or the predicted change in the votes cast for the Hispanic candidate (the dependent varia-

ble) for a one-percentage-point change in the percentage of Hispanic voting-age population (the independent variable).[25]

Using both the y-intercept and the slope, the predicted share of the Hispanic candidate's votes can be estimated in hypothetical "extreme" cases in which the Hispanic voting-age population is 100 percent or 0 percent. *See Teague*, 92 F.3d at 285 ("[e]xtreme case analysis looks separately at the actual votes [minority] candidates received in the most heavily [minority] and white precincts to give a clear indication of the preference of voters for either [minority] or white candidates in the two types of districts"); *see also Rollins*, 89 F.3d at 1210 n. 5. Extreme case analyses are generally based on precincts in which one race constitutes 90 to 100 percent of the population. As the percentage of the population analyzed falls below 90 percent, the analysis becomes less reliable and less useful. In this case, none of the four polling areas is one in which one race constitutes 90 to 100 percent of the population.[26] The extreme case analysis conducted for the PISD elections is based on hypothetical extreme precincts and used only as an analytical tool to estimate the support received by each PISD trustee candidate from Anglo and Hispanic voters.

The results of Dr. Flores's regression analysis for the PISD elections are summarized below: [27]

**25.** Pls. Ex. 31. Because of the secret ballot system, there is no method for determining with accuracy whether the Hispanic voters in the precinct actually voted for the Hispanic candidate. Dr. Alford demonstrated that "it is entirely possible, considering only the restrictions imposed by the totals, that one hundred percent of the vote for the Hispanic candidate could have come from the non-Hispanic community." Defs. Ex. 38. The correlation offers only an indication of estimated support.

**26.** In the Pasadena High School area, Hispanics constitute 35.33 percent of the voting-age population; in the South Houston High School area, they constitute 30.97 percent; in the Rayburn High School area, they constitute 20.80 percent; and in the Dobie High School area, they constitute 15.36 percent of the voting-age population.

**27.** Pls. Exs. 27–29, 46. Dr. Flores testified that the statistical significance level found in the exhibits presented should be taken "with a grain of

salt" in examining the election results. Generally, a statistical significance of .09 for a set of statistics indicates that, "at that particular level, ... these particular statistics could only occur by chance nine times out of a hundred.... [I]f you were in an experimental setting and you had the ability to draw samples from a larger population, in other words, if you could replicate this over and over again, then the statistical significance would mean something.... But, under these circumstances, since this is a one-time occurrence and you are never going to have an opportunity to replicate these again, ... [y]ou can't just throw the statistics away and reject them [even if the statistical significance level is low]." Dr. Flores testified that, instead of relying on statistical significance levels, the court should evaluate the results "in a historical context in Texas and Harris County." (Docket Entry Nos. 166, 167). Statistical significance levels do not appear in the court's summary table.

Regression Analysis of 1987–1997 PISD Election Results

| YEAR | CANDIDATE | R | SLOPE | Y–INTERCEPT | $R^2$ |
|---|---|---|---|---|---|
| 1987 | Valdez | .598 | .208 | 5.639 | .351 |
| | Orozco | -.0176 | -.048 | 43.989 | .0003 |
| 1989 | Garvey-Montanez | .712 | 2.11 | -1.550 | .512 |
| 1990 | Orozco | .782 | .504 | 76.026 | .611 |
| 1993 | Gutierrez | .158 | .046 | 2.901 | .025 |
| | Orozco | -.727 | -.858 | 72.340 | .519 |
| | Garcia | .990 | .208 | .405 | .967 |
| 1994 | Perez | .955 | .427 | .003 | .912 |
| | Castillo | -.167 | -.085 | .082 | .028 |
| | Segura | -.726 | -8.879 | 1.050 | .527 |
| 1995 | Hernandez | .745 | .562 | 2.421 | .555 |
| | Perez | .826 | 1.143 | 1.970 | .682 |
| 1997 | Gonzalez | .914 | N/A | .021 | N/A |

Dr. Flores testified that in his opinion, an R = .4 or above indicates a "good check" of the importance of race in voting behavior.[28] Dr. Flores cited other researchers, Delbert Miller and Earl Babbles, who also consider that an R = .4 indicates a strong relationship. Dr. Alford testified that ordinarily, when .4 = <R < = .6, there is a strong correlation between variables, but with smaller data sets this "rule of thumb" does not apply because any occurrence could be the result of random chance.

The experts' analyses, as well as the testimony of the fact witnesses, have been examined in detail by this court. The court's findings as to the expert and fact witnesses' testimony are set out below—first, in connection with the analysis of the individual elections, then in connection with how this analysis shapes the *Gingles* and *Zimmer* inquiries.

### 1. The 1987 Election (Position 2)

The candidates for Position 2 in the 1987 election were Stokes, Blumrick, Orozco (Hispanic), and Seiler. Orozco was elected, receiving 45.10 percent (2428/5383) of the total vote; 45.93 percent (435/947) of the vote in Pasadena; 49.33 percent (442/896) of the vote in South Houston; 57.22 percent (1058/1849) of the vote in Rayburn; 21.79 percent (277/1271) of the vote in Dobie; and 51.43 percent (216/420) of the absentee vote.[29]

Dr. Flores testified that the R for Hispanics voting for Orozco in the 1987 election for Position 2 was -.0176 with a y-intercept of 43.989. The Anglo candidates received a total of 2955 votes. Stokes received 1164 votes; Blumrick received 654; and Seiler received 1137. The Anglo candidates split the white vote. Orozco won the 1987 election for Position 2 by a plurality. Looking at y-intercepts and hypothesizing about homogeneous precincts, Dr. Flores estimated that in a hypothetical 100 percent Hispanic district, Orozco would have received 39.1 percent of the vote, while in a 0 percent Hispanic precinct, Orozco would receive 43.9 percent of the vote.

Dr. Flores testified that there was virtually no correlation between the race of the voters in any of the four polling places and the votes received by Orozco. Orozco was the preferred minority candidate in 1987 (and in 1990); she was not defeated by bloc voting.

### 2. The 1987 Election (Position 3)

The candidates for Position 3 in the 1987 election were Elam, Valdez (Hispanic), and Garner. Elam was elected, receiving 61.29 percent (3293/5373) of the total vote; 68.96 percent (651/944) of the vote in Pasadena; 57.89 percent (510/881) of the vote in South Houston; 73.21 percent (1347/1840) of the vote in Rayburn; 35.85 percent (460/1283) of the vote in Dobie; and 76.47 percent

28. Dr. Flores testified that a perfect R = 1.0 is unlikely in a voting study because voting behavior involves "human beings and there is all kinds of dimensions that can't quite be tapped by a statistic, and so there is always going to be a play in there." (Docket Entry No. 166, p. 10, lns. 14–18).

29. Defs. Ex. 4.

(325/425) percent of the absentee vote.[30] Valdez received 7.18 percent of the total vote; 4.87 percent of the vote in Pasadena; 8.63 percent of the vote in South Houston; 7.12 percent of the vote in Rayburn; 9.28 percent of the vote in Dobie; and 3.29 percent of the absentee vote.

Dr. Flores testified that the R for Hispanics voting for Valdez in the 1987 election for Position 3 was .598. Dr. Flores testified that the relationship between the Hispanic signature count and the votes received by Valdez was strong. There were 406 Spanish-surname voters in the election; Valdez received 386 votes.

The y-intercept was 5.639. Dr. Flores estimated that in a hypothetical 100 percent Hispanic district, Valdez would have received 26.2 percent of the vote, while in a 0 percent Hispanic district, Valdez would have received 5.6 percent of the vote.

Dr. Flores could not determine whether Valdez was the preferred minority candidate.

### 3. The 1988 Election (Position 5)

The candidates for Position 5 in the 1988 election were Early, Razo (Hispanic), Robison, and Blair. Blair was elected, receiving 51.22 percent (1840/3592) of the total vote; 66.04 percent (385/583) of the vote in Pasadena; 35.94 percent (230/640) of the vote in South Houston; 71.07 percent (764/1075) of the vote in Rayburn; 19.90 percent (192/965) of the vote in Dobie; and 81.76 percent (269/329) of the absentee vote.[31] Razo received 14.53 percent of the total vote; 10.63 percent of the vote in Pasadena; 47.03 percent of the vote in South Houston; 9.95 percent of the vote in Rayburn; 4.66 percent of the vote in Dobie; and 2.13 percent of the absentee vote.

No regression analysis of this election was presented.

### 4. The 1989 Election (Position 6)

The candidates for Position 6 in the 1989 election were Garvey–Montanez (Hispanic surname),[32] Rudd, Kowis, and Kendrick. Kendrick was elected, receiving 88.05 percent (2077/2359) of the total vote; 90.51 percent (458/506) of the vote in Pasadena; 83.72 percent (252/301) of the vote in South Houston; 92.30 percent (827/896) of the vote in Rayburn; 69.03 (185/268) of the vote in Dobie; and 91.49 percent (355/388) of the absentee vote.[33] Garvey–Montanez received 8.31 percent of the total vote; 5.53 percent of the vote in Pasadena; 13.95 percent of the vote in South Houston; 4.13 percent of the vote in Rayburn; 23.51 percent of the vote in Dobie; 6.70 percent of the absentee vote. Dr. Flores noted that there were 24 Spanish-surname voters in the Pasadena High School polling place, and Garvey–Montanez received 24 votes there. Garvey–Montanez received 27 votes at the Rayburn polling place, which had 26 Spanish-surname voters.

Dr. Flores testified that the R for Hispanics voting for Garvey–Montanez in the 1989 election for Position 6 was .712 with a y-intercept of—1.550. Dr. Flores estimated that in a hypothetical 100 percent Hispanic district, Garvey–Montanez would have received 99 percent of the vote, while in a 0 percent Hispanic district, Garvey–Montanez would have received 0 percent of the vote.

Dr. Flores testified that Garvey–Montanez was the preferred minority candidate and was defeated by white bloc voting.[34]

### 5. The 1990 Election (Position 2)

The candidates for Position 2 in the 1990 election were Orozco (Hispanic) and Jackson. Orozco was elected, receiving 81.19 percent (643/792) of the total vote; 78.61 percent (136/173) of the vote in Pasadena; 90.23 percent (120/133) of the vote in South Houston; 74.75 percent (222/297) of the vote in Rayburn; 85.42 percent (41/48) of the vote in Dobie; and 87.94 percent (124/141) of the absentee vote.[35]

**30.** Defs. Ex. 4.

**31.** Defs. Ex. 5.

**32.** Plaintiffs argued at trial that Garvey–Montanez was not Hispanic. Dr. Flores testified that he studied her as a Hispanic candidate because she had a Spanish surname. (Docket Entry No. 166, p. 68).

**33.** Defs. Ex. 6.

**34.** Pls. Ex. 51.

**35.** Defs. Ex. 7.

Dr. Flores testified that the R for Hispanics voting for Orozco in the 1990 election for Position 2 was .782 with a y-intercept of 76.026. Dr. Flores estimated that in a hypothetical 100 percent Hispanic district, Orozco would have received 99 percent of the vote, while in a 0 percent Hispanic district, Orozco would have received 76 percent of the vote.

Dr. Flores testified that Orozco was the preferred minority candidate. Dr. Flores did not find white bloc voting in this election.

### 6. The 1993 Election (Position 1)

The candidates for Position 1 in the 1993 election were Gutierrez (Hispanic), Roberts, Graham, and Briscoe. Roberts was elected, receiving 53.41 percent (3393/6353) of the total vote; 49.53 percent (525/1060) of the vote in Pasadena; 45.39 (458/1009) percent of the vote in South Houston; 48.45 percent (987/2037) of the vote in Rayburn; 61.71 percent (793/1285) of the vote in Dobie; and 65.49 percent (630/962) of the absentee vote.[36] Gutierrez received 3.20 percent of the total vote; 3.68 percent of the vote in Pasadena; 4.16 percent of the vote in South Houston; 2.90 percent of the vote in Rayburn; 2.18 percent of the vote in Dobie; and 3.64 percent of the absentee vote. There were 442 Spanish-surname voters in the election; Gutierrez received 203 votes. Dr. Flores testified that the R for Hispanics voting for Gutierrez in the 1993 election for Position 1 was .158 with a y-intercept of 2.901.

Dr. Flores could not determine whether Gutierrez was the preferred minority candidate.

### 7. The 1993 Election (Position 2)

The candidates for Position 2 in the 1993 election were Orozco (Hispanic) and Maxwell. Orozco was elected, receiving 68.26 percent (4383/6421) of the total vote; 68.97 percent (738/1070) of the vote in Pasadena; 61.04 percent (622/1019) of the vote in South Houston; 68.23 percent (1400/2052) of the vote in Rayburn; 66.26 percent (862/1301) of the vote in Dobie; and 77.73 percent (761/979) of the absentee vote.[37]

Dr. Flores testified that Maxwell, the Anglo candidate, was the preferred minority candidate. Dr. Flores estimated than in a hypothetical 100 percent Hispanic district, Maxwell would have received 99 percent of the vote, while in a 0 percent Hispanic district, Maxwell would have received 28.3 percent of the vote. Dr. Flores testified that the R for Hispanics voting for Orozco in the 1993 election for Position 2 was -.727 with a y-intercept of 72.340. Dr. Flores estimated that, in a hypothetical 100 percent Hispanic district, Orozco, the Hispanic candidate, would have received 17.7 percent of the vote, while in a 0 percent Hispanic district, Orozco would have received 72.3 percent of the vote.

### 8. The 1993 Election (Position 3)

The candidates for Position 3 in the 1993 election were Andrew, Heil, Leatherman, Garcia (Hispanic), Nelda Sullivan, and Crawford. Nelda Sullivan was elected, receiving 63.14 percent (3984/6310) of the total vote; 65.65 percent (686/1045) of the vote in Pasadena; 53.59 percent (537/1002) of the vote in South Houston; 62.94 percent (1272/2021) of the vote in Rayburn; 61.50 percent (789/1283) of the vote in Dobie; and 72.99 percent (700/959) of the absentee vote.[38] Garcia received 1.87 percent of the total vote; 1.82 percent of the vote in Pasadena; 2.59 percent of the vote in South Houston; 1.09 percent of the vote in Rayburn; 2.26 percent of the vote in Dobie; and 2.29 percent of the absentee vote. There were 443 Spanish-surname voters in the election; Garcia received 118 votes. If all Spanish-surname voters voted for Garcia, she still received only one-third of the Spanish-surname vote.

Dr. Flores testified that the R for Hispanics voting for Garcia in the 1993 election for Position 3 was .990 with a y-intercept of .405. Dr. Flores estimated that in a hypothetical 100 percent Hispanic district, Garcia would have received 63 percent of the vote while in a 0 percent Hispanic district, Garcia would have received 4 percent of the vote.

Dr. Flores could not determine whether Garcia was the preferred minority candidate.

**36.** Defs. Ex. 8.

**37.** Defs. Ex. 8.

**38.** Defs. Ex. 8.

### 9. The 1994 Election (Position 4) [39]

The candidates for Position 4 in the 1994 election were Ted Sullivan, Castillo (Hispanic), Filberth, Perez (Hispanic), Evans, and Jordan. Ted Sullivan was elected, receiving 58.36 percent (2105/3607) of the total vote; 54.79 percent (343/626) of the vote in Pasadena; 60.54 percent (339/560) of the vote in South Houston; 57.12 percent (658/1152) of the vote in Rayburn; 50.39 percent (327/649) of the vote in Dobie; and 70.65 percent (438/620) of the absentee vote.[40] Castillo and Perez together received 10.98 percent of the total vote; 13.74 percent of the vote in Pasadena; 11.07 percent of the vote in South Houston; 9.38 percent of the vote in Rayburn; 14.64 percent of the vote in Dobie; and 7.26 percent of the absentee vote.

Dr. Flores testified that in the 1994 election for Position 4, the R for Hispanics voting for Castillo was -.167 with a y-intercept of .082. Dr. Flores testified that the R indicated a very weak relationship. Dr. Flores estimated that in a hypothetical 100 percent Hispanic district, Castillo would have received 0 percent of the vote, and in a 0 percent Hispanic district, Castillo also would have received 0 percent of the vote.

Dr. Flores testified that the R for Hispanics voting for Perez was .955 with a y-intercept of .003. Dr. Flores testified that the correlation between Spanish–surname voters and votes received by Perez was "almost perfect," perhaps the highest he had encountered.[41] Dr. Flores estimated that in a hypothetical 100 percent Hispanic district, Perez would have received 43 percent of the vote, while in a 0 percent Hispanic district, Perez would have received 0 percent of the vote.

Dr. Flores testified that Perez, who received 149 out of 3,607 votes cast or under ten percent of the total votes cast, was the preferred minority candidate. Dr. Flores testified that whites voted as a bloc to defeat Perez.

### 10. The 1994 Election (Position 5)

The candidates for Position 5 in the 1994 election were Bennett, Segura (Hispanic), McClain, Briscoe, and Blair. Blair was elected, receiving 55.59 percent (1998/3594) of the total vote; 57.60 percent (360/625) of the vote in Pasadena; 56.73 percent (316/557) of the vote in South Houston; 61.69 percent (686/1112) of the vote in Rayburn; 31.28 percent (213/681) of the vote in Dobie; and 68.34 percent (423/619) of the absentee vote.[42] Segura received 5.95 percent of the total vote; 10.40 percent of the vote in Pasadena; 5.57 percent of the vote in South Houston; 4.23 percent of the vote in Rayburn; 7.05 percent of the vote in Dobie; and 3.72 percent of the absentee vote.

Dr. Flores testified that the R for Hispanics voting for Segura in the 1994 election for Position 5 was -.726 with a y-intercept of 1.050. Dr. Flores testified that in a hypothetical 100 percent Hispanic district, Segura would have received 37 percent of the vote, while in a 0 percent Hispanic district, Segura would have received 0 percent of the vote.

Dr. Flores could not determine whether Segura was the preferred minority candidate.

### 11. The 1995 Trustee Election

Dr. Flores testified that in the 1995 PISD trustee election, the R for Hispanics voting for Hernandez was .745 with a y-intercept of 2.421, and the R for Hispanics voting for Perez was .826 with a y-intercept of 1.970. Dr. Flores characterized each of the relationships as very strong.

### 12. The 1996 Election (Position 2)

Orozco (the Hispanic incumbent) ran unopposed in 1996. Orozco was reelected after receiving 3,159 votes.[43] Orozco received more total votes than any other candidate running in a PISD trustee election in 1996. Dr. Flores testified that he could not conduct a regression analysis of the election because Orozco ran unopposed. Dr. Flores could not

---

**39.** The 1994 and 1995 elections included six data points, in contrast to the four examined in the other elections. In addition to four polling places, Dr. Flores studied two absentee ballot boxes in the 1994–95 elections. (Docket Entry No. 166, pp. 30–31).

**40.** Defs. Ex. 9.

**41.** (Docket Entry No. 166, p. 29, lns. 12–17).

**42.** Defs. Ex. 9.

**43.** Defs. ex. 129.

determine whether Orozco was the preferred minority candidate. Orozco had not been the preferred minority candidate in the 1993 election. Dr. Flores would not speculate as to why, in an atmosphere characterized as racially polarized, Orozco was not opposed.

### 13. The 1997 Election (Position 5)

The candidates for Position 5 in the 1997 election were Blair (incumbent), Phillips, and Gonzalez (Hispanic). Blair was elected, receiving 71.81 percent (1243/1731) of the total vote; 84.69 percent (166/205) of the vote in Pasadena; 75.74 percent (206/292) of the vote in South Houston; 82.67 percent (434/543) of the vote in Rayburn; and 31.28 percent (213/681) of the vote in Dobie.[44] Gonzalez received 7.45 percent (129/1731) of the total vote; 6.63 percent (13/205) of the vote in Pasadena; 10.66 percent (29/292) of the vote in South Houston; 6.10 percent (32/543) of the vote in Rayburn; and 10.67 percent (48/506) of the vote in Dobie.

Dr. Flores testified to the congruence between votes cast for Gonzalez and the number of Spanish-surname voters.[45] Dr. Flores noted that Gonzalez received 129 votes in the 1997 election; there were 110 Spanish-surname voters in PISD for that election. Gonzalez received 13 votes in the Pasadena polling place, where there were 13 Spanish-surname voters. Gonzalez received 32 votes in Rayburn, which had 35 Spanish-surname voters. Gonzalez received 29 votes in South Houston, which had 25 Spanish-surname voters. Gonzalez received 48 votes in Dobie, which had 35 Spanish-surname voters. Gonzalez received 7 early votes; 7 Spanish-surname voters voted early.

Dr. Flores testified that the R for Hispanics voting for Gonzalez in the 1997 election for Position 5 was .914 with a y-intercept of -.021. Dr. Flores testified that in a hypothetical 100 percent Hispanic district Gonzalez would have received 100 percent of the vote, while in a 0 percent Hispanic district, Gonzalez would have received 0 percent of the vote.

Dr. Flores testified that Gonzalez was the preferred minority candidate and that whites voted as a bloc against him. The preferred minority candidate received less than 8 percent of the total vote.

### B. *Gingles* II: The Political Cohesion of the Minority Group

### 1. The Limitations of the Statistical Election Analysis

There is no data that allows a court to match an individual's vote to that individual's race or ethnicity. It is therefore difficult to predict which voters, Anglo or minority, within each polling place or precinct voted for particular candidates.

The small number of polling places, the low turnout typical of school board elections and typified by the PISD Board races, and the dispersed minority population in each polling place, all make regression analysis difficult in this case. As Dr. Alford testified, these factors limit the value of regression analysis and of an extreme or homogeneous precinct analysis.[46]

This court agrees that the problems with the reliability of the statistical evidence plaintiffs presented are significant. Indeed, plaintiffs themselves identified a defeated preferred minority candidate in only five races: Razo in 1989; Maxwell in 1993 (defeated by Orozco); Perez in 1994 and 1995; and Gonzalez in 1997. In the other six contested races examined, although Hispanics ran, plaintiffs were unable to conclude that they were preferred minority voters. Other than Razo, none of the defeated preferred minority candidates obtained ten percent of the total vote; most did not obtain five percent.

However, the lack of reliable evidence in itself reflects the lack of participation by Hispanics in the PISD elections. The very low turnout among Hispanics and the lack of serious candidates preferred by minority voters are part of the problem: a lack of participation by Hispanics in the political process

---

44. Pls. Exs. 70, 73.

45. Pls. Exs. 71, 72.

46. Absentee votes are cast in school board elections. It is normally impossible to analyze the absentee voting for racial make-up. However, because the regression analysis was based on the Spanish surname signature counts, absentee voting in this case does provide a fifth data point for use in the regression analysis.

of the PISD Board elections. The inability to draw statistically meaningful conclusions from regression analysis cannot end the inquiry as to whether voting dilution because of racial polarization is present. "To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove." *See Clark*, 88 F.3d at 1398 (the fact that "few or no black citizens ha[d] sought public office in the challenged electoral system d[id] not preclude a claim of vote dilution"); *citing Westwego*, 872 F.2d 1201, 1208 n. 9.

Dr. Flores testified that conclusions on political cohesion should not be based wholly on regression analyses "because fundamentally it leaves a lot to be desired.... [S]ometimes you can't really tap a lot of information with it, sometimes you can."[47] Dr. Flores testified that other methods can be used to supplement a study of voting behavior, such as extreme case analysis, underrepresentation analysis, turn-out analysis, and rank order analysis.

### 2. Hispanic Political Cohesion

■ Dr. Flores testified that there is a strong correlation between the number of Spanish–surname voters at each polling place in PISD Board elections from 1987 to 1997 and the numbers of votes received by Hispanic candidates.[48] Dr. Flores testified that the Rs indicated a strong relationship between race and voting behavior in the PISD elections. Dr. Flores testified that the regression analysis results were consistent with the presence of racially polarized voting, although Dr. Flores would not rely entirely on the results in concluding that racially polarized voting existed in the Pasadena Independent School District.

Orozco has consistently received equivalent levels of support from Hispanic and non-Hispanic voters. In her first election in 1987, there was no incumbent, and the Anglo vote was split among the three other candidates. In 1990, Orozco won a head-to-head contest with Jackson, and received 81.19 percent of the total vote; in 1993, Orozco defeated Maxwell in a head-to-head contest, receiving 68.26 percent of the total vote; and in 1996, Orozco was reelected after running unopposed.

The congruence between the number of votes cast for Hispanics in each polling area and the number of Spanish–surname voters in the polling area, and the regression analysis of Spanish surname signature counts against votes for Hispanic candidates, support the conclusion that Hispanics voters vote heavily in favor of Hispanic candidates. The high R value for Valdez in 1987, Garvey–Montanez in 1989, Garcia in 1993, Perez in 1994 and 1995, Hernandez in 1995, and Gonzalez in 1997, show that Hispanic voters strongly support Hispanic candidates. The analysis conducted by Dr. Flores and the testimony of Korbel show that the Hispanic community in the PISD is politically cohesive.

### C. *Gingles* III: Legally Significant Bloc Voting

■ "The amount of white bloc voting that can generally cancel out minority voting strength will, of course, 'vary from district to district according to a number of factors.' Among the factors affecting this inquiry is the percentage of registered voters in the district who are members of the minority group." *Rangel v. Morales*, 8 F.3d 242, 245 (5th Cir.1993); *quoting Gingles*, 478 U.S. at 55–57, 106 S.Ct. at 2769 (citation omitted). "[I]f the minority group constitutes only a small fraction of the total number of registered voters, it may be ... easier for the members of that [minority] group to establish their effective submergence in a white majority." *Rangel*, 8 F.3d at 245. 14.6 percent of registered voters in the PISD are Hispanic.[49]

Dr. Flores testified that the y-intercept value in the regression analysis of Spanish surname signature counts against votes for Hispanic candidates measures the amount of non-Hispanic support for a Hispanic candi-

---

**47.** (Docket Entry No. 166, p. 13, lns. 13–16).

**48.** Pls. Exs. 30–35, 72–73; Docket Entry No. 166, pp. 49–55.

**49.** Pls. Ex. 82.

date. Dr. Flores testified that in five out of eleven contested PISD elections between 1987 and 1995, there was white bloc voting. In four of the eleven elections, Dr. Flores was not able to draw any conclusions about white bloc voting from the data. In two elections, in which Orozco ran and won, Dr. Flores found an absence of white bloc voting.[50] *See Teague,* 92 F.3d at 288 ("[t]he Supreme Court in *Gingles* said that the results of a couple of elections do not discount the presence of racial bloc voting[;] ... a showing that bloc voting is not absolute does not preclude a finding of racial polarization"). With the exception of Orozco, the y-intercept value for Hispanic candidates is never greater than 6; Hispanic candidates received very few votes from non-Spanish-surname voters. The data suggests that whites vote against the preferred minority candidates, but the data is limited. *See Teague,* 92 F.3d at 289.

In determining whether racial polarization is present in a particular election, a court should distinguish between the serious candidates and the serious candidates. *Campos,* 840 F.2d at 1245 n. 7; *see also Teague,* 92 F.3d at 289. The distinction between serious and non-serious candidates is not based solely on the absolute numbers of votes received by a candidate. A court may take account of other factors, such as the percentage of support received from a segment of the population, or whether the candidate did the amount of work and spent a sum of money that characterize serious efforts to win an election in the district. The analysis presented to the court by plaintiffs did not attempt to distinguish "serious" candidates from non-serious candidates on any basis. *Campos,* 840 F.2d at 1245 n. 7.

Defendants argue that only Orozco and Razo were serious Hispanic candidates. Orozco was elected in 1987 and reelected in 1990, 1993, and 1996. Razo was defeated by Blair in the 1988 PISD election for position 5. Orozco testified that she campaigned seriously to get elected, spending $1,200 to $1,300, holding fundraisers, posting signs in strategic places, mailing pamphlets to registered voters, attending public meetings to answer voter questions, and running telephone banks before the election. Blair, who defeated Razo, also testified that he campaigned seriously, spending $2,000, polling residents, mailing pamphlets, contacting residents by telephone, placing signs in yards and public intersections, and attending public events. Defendants argued generally that the Hispanic candidates who were defeated did little or no campaign work to get elected, spent little or no money, and could not be considered serious candidates. Plaintiffs responded that the at-large system itself and the limited number and inconvenient location of polling places in the PISD make it difficult for Hispanic candidates to mount "serious" campaigns.

Plaintiffs' statistical analysis of voting dilution and racial polarization in the PISD is weakened by the small turnout of voters generally, by Hispanic voters in particular, the small "n" on which the analysis was based, and the absence of homogeneous "extreme" Hispanic voting precincts. However, the record shows that Hispanics have voted cohesively in the PISD and that, except for Orozco, Anglo voters generally have not voted for Hispanic candidates in the PISD elections.

## VI. The *Zimmer* Factors

### A. Voting Barriers

The PISD is the sixteenth largest school district in the state. If the PISD were a city, it would be the ninth largest in Texas. The size makes it difficult for first-time candidates to run for office without using expensive forms of campaigning. Inexpensive door-to-door campaigning is difficult in the PISD because of its size. *See Clark,* 88 F.3d at 1398 (unusually large election districts "enhance the opportunity for discrimination against the minority group").

From 1970 through 1992, 3 out of 461 election officials, or 0.64 percent, were Hispanic.[51] Election officials are selected by the school board. Korbel testified that the presence of minority election officials makes it more likely that minorities will vote. *Cf.*

---

**50.** Pls. Ex. 51.

**51.** Pls. Ex. 7.

*Harris v. Graddick,* 593 F.Supp. 128, 131 (M.D.Ala.1984) ("[t]he open and substantial presence of black poll officials, [those responsible for conducting the operations at a polling place], is a significant indication to many black persons that voting places are now open to all, that black persons not only have a legal right to come and vote, they are welcome. And of course, the more black poll officials there are, the greater the confidence black persons will have in the election process, and the less fear they will have about participating in that process"); *see also United States v. Marengo County,* 731 F.2d 1546 (11th Cir.) ("[t]wo election practices exacerbated the deficiencies in black participation: the low number of black poll officials and the failure of the registrar to abide by state · law.... By having few black poll officials and spurning the voluntary offer of a black citizen to serve as a registrar, county officials impaired black access to the political system and the confidence of blacks in the system's openness"), *cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984). The Hispanic voter registration and turnout for the PISD trustee elections are consistently as low as the proportion of Hispanic voting.[52]

Korbel and Dr. Flores testified that the PISD's limited number of polling places for the PISD elections, and their inconvenient location for minorities, have a negative impact on the turnout of minority voters.[53] *Cf. Perkins v. Matthews,* 400 U.S. 379, 386–90, 91 S.Ct. 431, 436–37, 27 L.Ed.2d 476 (1971) (in discussing the relocation of polling places under section 5 of the Voting Rights Act, the court noted that: the "abstract right to vote means little unless the right becomes a reality at the polling place on election day. The accessibility, prominence, facilities, and prior notice of the polling place's location all have an effect on a person's ability to exercise his franchise.... Locations at distances remote from black communities or at places calculated to intimidate blacks from entering ... might well have th[e] effect" of denying or abridging the right to vote on account of race).

The PISD has a markedly small number of polling places for its size. The district covers an 85 square-mile area and includes nearly 20,000 residents; but has only 4 polling places, inconveniently located with respect to where the Hispanic population is concentrated. There is no public transportation in the City of Pasadena. Other districts overlapping or neighboring PISD, which are often smaller than PISD, have many more polling places. For example, Galena Park in the San Jacinto College District is smaller than PISD and has 7 polling places. Single-member District 8 in the Houston Independent School District is smaller than PISD and has 45 polling places. The city of Pasadena has a population half the size of Pasadena's and uses more than 25 polling places for its elections.

For the December 1995 school bond election, the PISD used the same 4 polling places used for school board trustee elections, but also used mobile polling places which reached 10 sites before the election. The PISD held longer election hours for the bond election than it does for the school board trustee elections, keeping polling places open during PTA meetings and evenings. The voter turnout was significantly higher for the bond election than it was for any school board elections. No precise figures on voter turnout were offered into evidence. No evidence on minority voter turnout for the school bond election was presented. Defendant and PISD trustee Blair testified that the bond election involved more controversial issues than did the school board elections; and that the controversy justified the exceptionally longer voting hours, the more numerous polling places and the higher turnout for the school bond election.

The evidence of voting barriers is credible and unrebutted. These *Zimmer* barriers are reflected in the lack of participation of the Hispanic community in the political process of selecting PISD trustees.

## B. Candidate Slating Process

A group called Communities United for Better Schools ("CUBS") has played a signif-

---

52. 14.6 percent of registered voters in the PISD are Hispanic. Pls. Ex. 82.

53. Defs. Ex. 42.

icant role in the campaigns of successful candidates. Newspaper articles about PISD elections repeatedly referred to candidates running on the "CUBS ticket" or under the "CUBS banner." CUBS backed Orozco in two of her three candidacies for PISD Board. Orozco is the only Hispanic candidate to have received CUBS' endorsement.

The analysis of PISD campaign contributions from 1986–1993 indicates that of the seven or eight biggest contributors, all contribution checks were written on the same date. The biggest contributor, Barmore Insurance Company, did not contribute to any Hispanic candidate until Orozco's second race in 1990.[54] These contribution patterns are consistent with a candidate slating group.

The court finds that CUBS has functioned as a slating committee for candidates for the PISD Board. There is no evidence as to whether CUBS continued to do so after the 1996 elections.

### C. Vestiges Within the School System

Dr. Flores testified to the underrepresentation of Hispanics on the PISD Board. Dr. Flores calculated the degree of underrepresentation by subtracting the percent of Hispanic population from the percent of Hispanic representation.

Hispanics have been consistently underrepresented on the PISD Board, by an average of 19.1 percent between 1980 and 1995. The aggregate index of inequity over that fifteen-year period is –306 percent.[55] The degree of underrepresentation was higher in 1995 (–22.5 percent), with one Hispanic board member, than it was in 1980, with no Hispanic on the board (–17.6 percent).

The Hispanic student population has been consistently underrepresented on the PISD Board, by an average of 26.7 percent, between 1981 and 1993.[56] The aggregate index of inequity over a twelve-year period is –346.9 percent. The degree of underrepresentation was highest in 1993 (32.9 percent),

with one Hispanic board member. The degree of underrepresentation steadily increased between 1981 and 1986; decreased between 1986 and 1987, when a Hispanic was elected to the school board; and then increased steadily again between 1987 and 1993.

### D. Socioeconomic Factors

According to the Texas Employment Commission, the unemployment rate in Harris County in July 1994 was an average of 7.1 percent for all populations; 9.3 percent for Hispanics; 14.2 percent for African–Americans; and 4.3 percent for non-minorities. In January 1995, the unemployment rate was 6.2 percent for all populations; 8.2 percent for Hispanics; 12.6 percent for African–Americans; and 3.8 percent for non-minorities.[57]

According to the 1990 census, 13.9 percent of the population of PISD is below the poverty line.[58] 21.2 percent of the Hispanic population, 20.8 percent of the African–American population, and 12.1 percent of the Anglo population of PISD had a 1989 income below the poverty level. The per capita income for all caucasians, including Hispanics, is $13,043, $10,175 for African–Americans, and $7,386 for Hispanics. According to the 1990 census, approximately 78.6 percent of the caucasian population within the PISD, including Hispanics, has an annual household income of at least $15,000, 74.9 percent of the African–American population of the PISD has an annual household income of at least $15,000, and 72.1 percent of the Hispanic population of the PISD has an annual household income of at least $15,000.

Approximately 5.4 percent of the Anglo population over the age of 25 of the PISD is functionally illiterate. Approximately 5.2 percent of the African–American population of the PISD over the age of 25 is functionally illiterate. Approximately 34.0 percent of the Hispanic population of the PISD over the age of 25 is functionally illiterate. According to

54. Barmore also provided telephones for use in phone banks.

55. Pls. Ex. 8; Docket Entry No. 166, pp. 56–59.

56. Pls. Ex. 9–3.

57. Pls. Ex. 5.

58. Pls. Ex. 6.

the 1990 census, 30.3 percent of the total population of the PISD over the age of 25 did not graduate from high school. Approximately 26.9 percent of the Anglo population of the PISD over the age of 25 did not graduate from high school. Approximately 20.3 percent of the African–American population of the PISD did not graduate from high school. Approximately 58.0 percent of the population over the age of 25 of the Hispanic population did not graduate from high school. According to the 1990 census, 12.3 percent of the total population of the PISD over the age of 25 are college graduates. Approximately 12.7 percent of the Anglo population of the PISD over the age of 25 are college graduates. Approximately 18.9 percent of the African–American population over the age of 25 of the PISD are college graduates. Approximately 4.5 percent of the Hispanic population of the PISD over the age of 25 are college graduates.

The socioeconomic data before this court does not distinguish between Hispanics who are recent immigrants and those who have been in this country for longer periods, particularly those who are citizens. This information is important to this analysis, but was not presented. The data before this court does not show that these socioeconomic differences between the white and Hispanic communities in the PISD interfere with Hispanic citizens' meaningful participation in the political process. *Clements,* 999 F.2d at 866–

68; *see also Clark,* 88 F.3d at 1399 (proof of socioeconomic disparities "without more" was insufficient to show the presence of this factor).

### E. Exogenous Elections

Dr. Alford testified that an analysis of primary elections is preferable to general elections because primary elections are nonpartisan and cannot be influenced by the partisanship factor. Dr. Flores testified that a study of general elections includes a broader cross-section of the voting population than primary or run-off elections. The court finds that the primary elections examined by Drs. Flores and Alford are insufficiently probative of general voting behavior to be helpful in this case. The court therefore examines the exogenous general elections.

#### 1. Regression Analyses of Exogenous General Elections

Dr. Flores testified that he examined exogenous general elections in which minority candidates ran against Anglo candidates. Dr. Flores analyzed the performance of the minority candidates against the Anglo candidates in precincts either partially or wholly contained within the PISD jurisdiction.

In exogenous elections between 1986 and 1990, in which minority candidates ran, the results of Dr. Flores's regression analysis were as follows:

Regression Analysis of Exogenous 1986–1990 General Elections [59]

| ELECTION | CANDIDATE | R | R[2] | Y-int | Estimated Anglo Vote | Estimated Hispanic Vote |
|---|---|---|---|---|---|---|
| 1986-Supreme Court, Pl. 4 | Gonzalez | .68 | .46 | .44 | 44% | >99% |
| 1988-Supreme Court, Pl. 4 | Gonzalez | .74 | .55 | .475 | 47.5% | >99% |
| 1988-179th Dist. Ct. | Guerrero | .74 | .54 | .412 | 41.2% | >99% |
| 1988-351st Dist. Ct. | Salinas | .69 | .47 | .427 | 42.7% | >99% |
| 1990-Attorney General | Morales | .66 | .44 | .391 | 39.1% | >99% |
| 1990-157th Dist. Ct. | Garcia | .67 | .45 | .399 | 39.9% | >99% |
| 1990-314th Dist. Ct. | Fraga | .64 | .41 | .394 | 39.4% | >99% |

For 1994 and 1996 exogenous elections, Dr. Flores repeated the analysis he had conducted for the 1986–1990 elections. Dr. Flores

did not identify the position for which the candidates ran in the 1994 and 1996 exogenous elections examined; or identify all the

59. Pls. Ex. 26. Dr. Flores's analysis of exogenous elections, which used registered voter date, yielded results similar to those of Dr. Alford, who used voting-age population data. *See* Defs. Ex. 12.

candidates running in the 1994 elections. Dr. Flores testified that, in exogenous elections in 1994 and 1996 in which minority candidates ran, the results of the regression analysis of Hispanic voting were as follows:

Regression Analysis of Exogenous 1994 and 1996 General Elections [60]

| YEAR | CANDIDATE | R | R[2] | Y-Intercept | Estimated Anglo Support | Estimated Hispanic Support |
|------|-----------|-----|------|-------------|------------------|---------------------|
| 1994 | Morales   | .230 | .053 | .441 | 44.1% | 77.2% |
| 1994 | Correa    | .378 | .143 | .282 | 28.2% | 89% |
| 1994 | Mendoza   | .390 | .152 | .319 | 31.9% | 93.6% |
| 1994 | Guerrero  | .328 | .107 | .337 | 33.7% | 86.6% |
| 1994 | Fraga     | .378 | .143 | .302 | 30.2% | 92% |
| 1994 | Hinajosa  | .397 | .158 | .308 | 30.8% | 94.5% |
| 1994 | Mejia     | .356 | .127 | .323 | 32.3% | 91% |
| 1994 | Leal      | .367 | .134 | .337 | 33.7% | 92% |
| 1996 | Morales   | .475 | .226 | .381 | 38.1% | 98.5% |
| 1996 | Uribe     | .462 | .214 | .333 | 33.3% | 95% |
| 1996 | Garcia    | .426 | .181 | .425 | 42.5% | 98.9% |
| 1996 | Medina    | .409 | .167 | .603 | 60.3% | 8% |
| 1996 | C. Garcia | .434 | .188 | .416 | 41.6% | 99.3% |
| 1996 | Salinas   | .437 | .191 | .392 | 39.2% | 98% |

Dr. Flores testified that the PISD jurisdiction included an unusual number of precincts with very small voter registration numbers. In such precincts, the correlation was overly sensitive to the small numbers of votes cast.[61] Dr. Alford testified generally, that with small data sets, any occurrence could be the result of chance. Dr. Flores repeated his analysis of 1994 and 1996 elections after removing as data points precincts which included fewer than 100 registered voters. For the 1994 elections, Dr. Flores studied 77 precincts, removing 35 precincts with fewer than 100 registered voters; for the 1996 elections, Dr. Flores studied 81 precincts, removing 30 precincts with fewer than 100 registered voters.[62] In removing small precincts, Dr. Flores did not remove many votes from the "n" analyzed, and in fact removed more votes cast for the Hispanic candidates than for the Anglo candidates.[63] Dr. Flores did not remove any precincts in his examination of the

1986 to 1990 exogenous elections. Several small precincts removed from the 1994 and 1996 analyses were created by the Harris County redistricting after 1990.

Dr. Flores testified that the narrower analysis of precincts, including only precincts with more than 100 registered voters, resulted in estimated levels of support received by Hispanic candidates similar to those found in the first analysis. However, the R coefficients in the second analysis indicated stronger relationships than did the original analysis; the R coefficients for the narrower analysis were in the .6 to .7 range, as opposed to the .3 to .4 range found in the original analysis.[64]

Dr. Alford testified that instead of simply removing small precincts from his analysis, Dr. Flores could, and perhaps should, have weighted the precincts according to their

60. Pls. Exs. 66, 77, 66A, and 67.

61. For example, Dr. Flores noted that in precinct 762, which included 0 Spanish-surname registered voters, only one vote was cast; the result showed that the candidate who received that vote got 100 percent of the precinct's support. Pls. Ex. 66.

62. Pls. Exs. 78, 80.

63. Dr. Flores testified that, in the 1994 elections, 39,540 votes were cast in total. By looking at only 77 precincts, Dr. Flores studied 39,063 votes. The difference was 1.2 percent. Pls. Ex. 68.

64. Pls. Exs. 81, 79.

registered-voter size.[65] Weighting is a method used to emphasize the importance of certain data points over others; it can be proportional (in which case the "n" stays constant) or multiplicative (the "n" increases). Dr. Alford also testified, however, that voting rights cases generally do not resort to weighted regressions. Dr. Flores testified that the practice of weighting is debated in the statistics field because of the fear of masking data.

### 2. General Analysis of the Exogenous Elections

The only incumbents defeated in the exogenous general elections examined by Dr. Flores and Korbel were Mexican–American. Dr. Flores did not analyze the effect of incumbency on the election results.

Dr. Flores testified that the exogenous election results are consistent with racially cohesive and polarized voting because Hispanics voted in high percentages for Hispanic candidates, yet those candidates were defeated by Anglo bloc voting. Dr. Flores testified that in every 1994 and 1996 exogenous general election examined, with the exception of the Medina election, the preferred minority candidate was defeated within the PISD jurisdiction. While Anglos did support Hispanic candidates in exogenous elections, they did not do so to the degree that Hispanics did. Dr. Flores testified that party affiliation was a significant factor accounting for Anglo support of Hispanic candidates in general elections.

Dr. Flores testified that every preferred minority candidate (defeated within the PISD) was a Democrat. Medina was a Hispanic candidate but was not the preferred minority candidate; Medina was a Republican. Dr. Flores did not know the extent to which straight-ticket voting influenced the results of the exogenous general elections. Dr. Flores testified that he could not estimate the degree of influence which party affiliation had on his analysis.

Dr. Alford testified that the partisan nature of the exogenous elections severely limited the value of the analysis. *But see Houston*, 56 F.3d at 612 ("[w]hile evidence that divergent voting patterns are attributable to partisan affiliation ... rather than race is quite probative on the question of a minority group's future success at the polls, ... evidence that lacks such evaluation of the voters' possible motivations still carries probative value"). Dr. Alford testified that, in the 1994 and 1996 exogenous general elections analyzed, every winner was Republican but not every winner was Anglo.[66] Looking at the 1996 Medina candidacy and the 1994 performance of Morales in precinct 29, Dr. Alford testified that the pattern of the election results indicated that party affiliation explained voting behavior better and more consistently than race.

Dr. Alford testified that the homogeneous precinct analysis of exogenous elections is hindered by the absence of polling places 90 percent or more Hispanic, and by the limited number of polling places or observation points. Dr. Flores testified that, although there were no homogeneous polling places within the PISD, there were several homogeneous precincts wholly or partially contained in the PISD.

The exogenous elections analyzed within the PISD jurisdiction reveal Hispanic political cohesion. However, the elections do not show whether the preferred minority candidates are defeated in the PISD because of racial polarization or because of factors such as incumbency and party affiliation.

### F. Racial Appeals

Plaintiffs did not argue that political campaigns in the PISD have been characterized by overt or subtle racial appeals.

### G. Responsiveness of the PISD

Plaintiffs did not challenge the responsiveness of the PISD.

### H. The Value of the State's Interest

The state's interest in maintaining the PISD at-large election system must be

---

**65.** For example, if a total registered voter population equaled 100, a precinct with one voter would carry a 1/100 weight.

**66.** Pls. Ex. 69.

weighed against the plaintiffs' claim of racial dilution. *Clements,* 999 F.2d at 868.

The PISD uses the at-large election system so that each member of the PISD board of trustees will in effect represent every student and every parent within the PISD. In this way, the school board feels that they avoid the factionalism that they fear would divide a single-district elected board. Testimony at trial established that the current board of trustees acts as a harmonious unit. Individual members may disagree over policy decisions, but they have worked together to enact the edicts of the board.

The Fifth Circuit has recognized that the state may have legitimate interest in such at-large voting. *Clements,* 999 F.2d at 868; *see also Brewer,* 876 F.2d at 454–55.

## VII. Evidence of Invidious Discriminatory Intent

Plaintiffs argue that the PISD's maintenance of the current at-large election system and its failure to adopt a single-member-district election system are intentional acts of discrimination which violate the Fourteenth and Fifteenth Amendments. *Arlington Heights,* 429 U.S. at 264–66, 97 S.Ct. at 563; *Washington,* 426 U.S. at 238–42, 96 S.Ct. at 2047–48.

▮▮▮ There is insufficient credible evidence that a discriminatory purpose motivated the PISD board members in their decision not to adopt a single-member-district election system. The PISD's failure to adopt a single-member-district election system by itself is not evidence of discriminatory intent. *See, e.g., LULAC v. Clements,* 999 F.2d at 868; *Brewer,* 876 F.2d at 454–55.

## CONCLUSIONS OF LAW

### I. *Gingles* I: A Sufficiently Large and Geographically Compact Group

To meet the first *Gingles* requirement, plaintiffs must show that it is possible to draw one or more majority-minority districts. Drawing majority-minority districts requires a minority population that is of sufficient size and compactness to allow for the construction of a compact and contiguous district in which the minority group can form an effective voting majority. "[T]he first *Gingles* factor ensures that the minority has the potential to elect a representative of its own choice in some single-member district.... Absent a satisfactory showing on the first *Gingles* factor, minority voters cannot claim that it is the current districting system ... that is the source of their disproportionately weak political strength." *Clark,* 88 F.3d at 1406; *citing Growe,* 507 U.S. at 39–41, 113 S.Ct. at 1084.

Plaintiffs must establish that it is possible to create a majority-minority district of voting-age citizens. *Gingles,* 478 U.S. at 49–51, 106 S.Ct. at 2766; *McNeil,* 851 F.2d at 944–45; *Dickinson,* 933 F.2d at 503 ("a simple majority of eligible voters in the single-member district"); *Morris,* 894 F.Supp. at 1065 ("using data of voting age Hispanic citizens is the correct measure of the Hispanic population's ability to create a majority voting district"); *Milwaukee Branch of the NAACP,* 929 F.Supp. 1150 ("citizenship rates can be taken into account in resolving the issue whether a plaintiff has satisfied the first *Gingles* condition[; i]ndividuals who are not citizens are not eligible voters[; t]hose ineligible to vote are not among those whose votes have been diluted within the meaning of section 2"); *Romero,* 665 F.Supp. at 854 (stating that *Gingles* refers to effective voting majorities, rather than raw population totals, as the touchstone for determining geographical compactness); *Skorepa,* 723 F.Supp. at 1388–89.

The 1990 census is inaccurate to some extent. However, the only estimates of the extent to which it is unreliable, and the only estimates of the current PISD population, are also unreliable estimates. The choice is between an outdated actual count and an estimated projection based in part on that count and in part on assumptions and mathematical applications. The population projections plaintiffs offered were not sufficiently accurate or reliable to overcome the presumption of census accuracy. *See McNeil,* 851 F.2d at 945–46; *see also Graves,* 446 F.Supp. at 568; *see also Skorepa,* 723 F.Supp. at 1390. Plaintiffs have not established that, based on the 1990 census, the

best available data before this court, it is possible to form a compact single-member district in the PISD that would have a majority of Hispanic voting-age citizens as residents.

## II. *Gingles* II: Political Cohesion of the Minority

Plaintiffs must establish that the Hispanics in the PISD are politically cohesive. *Gingles*, 478 U.S. at 49–53, 106 S.Ct. at 2766–67. The congruence between the number of votes cast for Hispanics in each polling area and the number of Spanish-surname voters in each polling area, and the regression analysis of Spanish surname signature counts against votes for Hispanic candidates, indicate that Hispanics voters vote heavily in favor of Hispanic candidates. This court concludes that the Hispanic community is politically cohesive. *Gingles*, 478 U.S. at 55–59, 106 S.Ct. at 2769–70; *see also Teague*, 92 F.3d 283.

## III. *Gingles* III: Legally Significant Bloc Voting

To establish legally significant white bloc voting, plaintiffs must demonstrate that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate, in the absence of special circumstances. *Gingles*, 478 U.S. at 49–51, 106 S.Ct. at 2766. Plaintiffs "must present evidence of a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes. It is the 'usual predictability of the majority's success [that] distinguishes structural dilution from the mere loss of an occasional election." *Rangel*, 8 F.3d at 244–45; *quoting Gingles*, 478 U.S. at 55–57, 106 S.Ct. at 2769.

Between 1987 and 1997, Orozco was the only Hispanic candidate to gain the support of Anglo voters and election to the PISD board. *See Teague*, 92 F.3d at 288 ("the results of a couple of elections do not discount the presence of racial bloc voting[;] . . . a showing that bloc voting is not absolute does not preclude a finding of racial polarization[;] . . . to be legally significant, racial polarization need only be the usual pattern for a significant proportion of voters"). With the exception of Orozco, the Hispanic pre-ferred candidates who ran for a position on the PISD board between 1987 and 1997 received very few votes from non-Hispanic voters. However, this court need not decide whether the absence of white votes for Hispanic preferred candidates is the result of racial polarization or of the absence of serious minority candidates.

## IV. The *Zimmer* Factors

Hispanics have been consistently under-represented on the PISD board. Hispanics in the PISD face hindrances to their participation in the political process of electing school board members. PISD's large population and size make it difficult for first-time candidates to run for office without using expensive forms of campaigning. The PISD Board has consistently failed to appoint Hispanic election officials. *See Graddick*, 593 F.Supp. at 131; *cf. Marengo County*, 731 F.2d at 1570. The very small number of polling places, the inconvenient location and hours of those polling places, and the lack of public transportation within the PISD, also discourage Hispanic voting. *See Perkins*, 400 U.S. at 386–90, 91 S.Ct. at 436–37. The incumbents' system of pooling their campaign funds put challengers at a financial disadvantage. The CUBS has been very influential in helping candidates raise funds and in determining which candidates are successful.

Insufficient evidence was presented at trial to establish that health concerns or any other socioeconomic factors hinder the Hispanic community's ability to participate effectively in the political process in the PISD. Plaintiffs do not contend that elected officials on the PISD Board have been unresponsive to the particularized needs of the Hispanic community.

The policy rationale underlying the PISD's use of the at-large system is not tenuous. The Board has made a valid policy choice to avoid single-member elections so that each Board member represents every student and every parent within the PISD. In this way, the Board seeks to avoid the factionalism that they fear would divide a single-district elected board.

## V. The Totality of the Circumstances

Because plaintiffs cannot meet the first *Gingles* threshold, they have not established that they "do not have an equal opportunity to participate in the political processes and to elect candidates of their choice"; that the at-large election system used by the PISD denies or abridges their right to vote on account of their race, color, ethnicity; or that the at-large election system dilutes the vote of minorities or minimizes their electoral influence, in violation of their civil rights. *See Growe*, 507 U.S. at 39–41, 113 S.Ct. at 1084 ("[u]nless these [*Gingles*] points are established, there neither has been a wrong nor can be a remedy").

However, plaintiffs have raised serious and valid concerns that hindrances to equal opportunity to participate in the political process are present. The small number and inconvenient location of polling places, the short polling hours, the absence of minority election officials, and the incumbents' campaign-fund pooling system, in a district as large as the PISD, may hinder the Hispanic community from voting in the PISD elections and seeking election to the Board.

## VI. The Fourteenth and Fifteenth Amendments

There is insufficient evidence of intentional discrimination against minorities in the PISD Board of Trustees elections. On the present record, this court does not find discriminatory intent, in violation of the Fourteenth or Fifteenth Amendments to the United States Constitution.

## VII. Conclusion

Plaintiffs' theory of this case is that the current at-large election system and white bloc voting prevent minority candidates from being elected to the board of trustees of the PISD. Plaintiffs have raised valid concerns as to hindrances to Hispanic participation in the PISD political process. However, plaintiffs have not proven that it is possible to create a single-member district in which the majority of voting-age citizens is Hispanic. Because plaintiffs have not met the "necessary preconditions[ ]" set out in *Gingles*, 478 U.S. at 49–51, 106 S.Ct. at 2766, this court must find in favor of defendants.

APPENDIX

CHART I:                                    CHART II:

PISD Population                    PISD VAP Population

Comparison of Votes Received

CHART III:

---

**ORDER OF DISMISSAL**

In accordance with the Court's Memorandum and Opinion of even date, this action is DISMISSED.